RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0034p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 19-4172

WILLIAM WHEAT, JR.,

*Defendant-Appellant.*

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cr-00246-4—Benita Y. Pearson, District Judge.

Argued: January 29, 2021

Decided and Filed: February 12, 2021

Before: SUTTON, BUSH, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Stephen Ross Johnson, RITCHIE, DILLARD, DAVIES & JOHNSON, P.C., Knoxville, Tennessee, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Stephen Ross Johnson, RITCHIE, DILLARD, DAVIES & JOHNSON, P.C., Knoxville, Tennessee, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────

## OPINION

─────────────

MURPHY, Circuit Judge. Our court has long interpreted the drug-conspiracy statute, 21 U.S.C. § 846, to prohibit two individuals from knowingly reaching an agreement to distribute drugs. *See, e.g.*, *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). This conspiracy test

could be read to cover every drug transaction between a willing seller and a willing buyer, even those for the buyer's personal use.  After all, the seller has agreed with the buyer to "distribute" drugs between them.  Yet we have also long held that a buyer-seller agreement alone does not establish a "conspiracy" under § 846.  *See, e.g.*, *United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir. 1977).  This case requires us to consider the justification for and scope of this "buyer-seller" exception to our otherwise broad reading of the drug-conspiracy statute.

The government presented overwhelming evidence that Aaron Reels operated a drug-distribution scheme.  The problem?  Reels was not on trial.  William Wheat was.  And the evidence against Wheat showed essentially that he once gave Reels a .3-gram free "sample" of heroin—a sample that led to no further exchanges between them.  The government alleged that Wheat agreed with Reels to distribute heroin, and a jury convicted him of a drug conspiracy.  We conclude, however, that insufficient evidence supports this conviction.  The logic underlying our buyer-seller exception extends to Wheat's agreement to distribute a sample to Reels.  And the government did not present enough additional evidence of a broader agreement between Wheat and Reels to distribute heroin to third parties.  At the same time, Wheat used his phone to arrange the exchange of the sample.  So the government more than sufficiently proved that he used a "communication facility" to facilitate a drug felony.  21 U.S.C. § 843(b).  We thus reverse Wheat's conspiracy conviction, affirm his communication-facility conviction, and remand for resentencing.

I

Reels operated a substantial drug-trafficking ring that sold cocaine, heroin, and fentanyl in Cleveland, Ohio.  He had multiple heroin suppliers and regularly purchased up to 500 grams of heroin at a time.  He would resell this drug in quantities ranging from a gram to an ounce (about 28 grams).

Reels and Wheat were social acquaintances who did not know each other well.  In February 2018, Wheat passed along his phone number to Reels through social media.  When Reels called, Wheat said that he had come across "something" in Reels's "field."  Reels asked: "How is it?"  Wheat responded that he would like Reels's opinion ("You tell me"), but that

"they" had told him it was "nice." Reels next inquired if "it" had been diluted: "It ain't been played around with, have it?" Wheat assured him: "I don't play around with anything."

The two arranged to meet at a Circle K gas station the next day. While there, Wheat gave Reels a free "sample" of about .3 grams of heroin. Samples are often exchanged between drug dealers who do not know each other well to help potential purchasers decide whether to buy from potential sellers. Testimony in this case suggested that the .3 grams would otherwise cost about $20 to $40 on the Cleveland drug market.

Following their exchange, Reels and Wheat went their separate ways. As for Wheat, a local police officer pulled him over for a traffic violation. The officer let him go with a warning. As for Reels, he immediately called Carl Mileca, a heroin user, and asked him to test the sample. Mileca later informed Reels that Wheat's sample had been strong but not as strong as another recent sample. Mileca also stated that the heroin looked good, had a good smell, and did not have "cut" in it that would dilute its potency. He opined that Reels's customers would buy it.

Reels nevertheless decided not to purchase any heroin from Wheat. He had substantial heroin in "stock" and was not in need of more. Reels and Wheat had no further interactions.

It turns out, however, that Reels's drug trafficking had drawn the attention of the Drug Enforcement Administration (DEA). Since October 2017, Reels had unwittingly sold large amounts of drugs to confidential informants working with the DEA. DEA officers had also been tracking Reels's movements (using a device on his car) and conversations (using a wiretap on his phone).

Through these efforts, the officers understood that Reels had been "shopping around" for heroin suppliers when he met with Wheat. They recorded the phone conversation between Reels and Wheat and secretly monitored them at the Circle K. Because the DEA officers had not previously come across Wheat, they asked the local police officer to pull him over to make an identification. The DEA officers had also learned that Mileca was Reels's main "tester" who tried samples to determine the quality of each source's heroin. They recorded Reels's calls with Mileca, including the call about Wheat's sample.

Two months after Reels's interaction with Wheat, the officers executed search warrants at Reels's properties. They recovered 319 grams of heroin, 200 grams of a heroin-fentanyl mixture, and 138 grams of cocaine.

The government charged Reels and six others, including Wheat, in an 18-count indictment. The indictment listed Wheat on two counts. The first charged Wheat with a conspiracy to possess with intent to distribute and to distribute at least 100 grams of heroin and 40 grams of fentanyl—quantities that would subject him to a minimum five-year sentence. 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846. The second charged Wheat with using a communication facility (his phone) in furtherance of a drug-trafficking crime. *Id.* § 843(b).

After the other defendants pleaded guilty, Wheat stood trial. At the close of the evidence, the government withdrew the drug-quantity charges from the conspiracy count. It took this "unorthodox step" due to the lack of evidence that Wheat could foresee that the conspiracy involved those quantities. So, on the first count, the jury was asked simply whether Wheat had entered into a conspiracy to distribute or possess with intent to distribute heroin or fentanyl. The second communication-facility count remained unchanged. Ultimately, the jury found Wheat guilty on both counts. The court sentenced him to an above-guidelines 27-month term of imprisonment.

II

A

Wheat raises various challenges to his conspiracy conviction, but we begin and end with his sufficiency-of-the-evidence challenge. He argues that, without more, his decision to give a heroin sample to a known drug dealer does not show that he entered into an agreement to distribute drugs with the dealer under 21 U.S.C. § 846. Wheat faces a demanding standard of review: He must show that no rational jury could have found the essential elements of a conspiracy beyond a reasonable doubt. *See United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). "Yet the issue here, or at least the aspect we find troubling, actually poses the 'legal' question whether the conduct the jury could reasonably have found to have occurred amounts to a conspiracy under the statute." *United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993).

We thus start with "first principles" about what qualifies as a drug conspiracy under 21 U.S.C. § 846. *Id.*

The drug laws make it "unlawful" to "knowingly or intentionally" "distribute" or "possess with intent to . . . distribute . . . a controlled substance[.]" 21 U.S.C § 841(a)(1). They, in turn, make it unlawful to conspire to commit these crimes: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." *Id.* § 846. When analyzing the meaning of this conspiracy statute, we think it helpful to separate the basic *legal* question (what does the statute require?) from the basic *evidentiary* question (what evidence will allow a jury to find the statutory requirements?).

1. *What does the conspiracy statute require?* Although our caselaw sometimes lists three elements to prove a conspiracy under § 846, our model jury instructions identify only two. Yet a mere "semantic difference" separates these tests. *Potter*, 927 F.3d at 453. Stated succinctly, a drug conspiracy requires the government to show that two or more individuals have agreed to violate a drug law (such as § 841(a)(1)'s ban on distributing drugs) and that the defendant knowingly and voluntarily entered into this agreement. *See id.* This drug-conspiracy test comports with the usual understanding of a "conspiracy," "the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975).

As the test shows, conspiracy (like attempt) is an "inchoate" offense. *See United States v. Robinson*, 547 F.3d 632, 638 (6th Cir. 2008). The government need not prove that the conspirators completed their agreed-upon drug crime. *See id.* In fact, it need not prove that the conspirators even took an overt act to implement the crime. *United States v. Shabani*, 513 U.S. 10, 17 (1994). The knowing agreement to distribute drugs in violation of § 841(a)(1) is itself the completed crime of a distribution conspiracy. The traditional theory behind barring this type of agreement (not just the underlying crime or an attempt to commit it) is that "the banding together of two or more persons and a pooling of their talents and resources" increases the risk that the crime will occur and that the conspirators will commit other crimes. 4 Charles E. Torcia, *Wharton's Criminal Law* § 678 (15th ed.), Westlaw (database updated Aug. 2020); *Moran*, 984 F.2d at 1302–03.

The agreement thus separates the crime of conspiring to distribute drugs (in violation of § 846) from the crime of distributing drugs (in violation of § 841(a)(1)). *See United States v. Loveland*, 825 F.3d 555, 557 (9th Cir. 2016); *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011). This agreement need not be recorded or even express. It can be an unspoken "meeting of the minds" that two or more people will jointly achieve a drug-distribution end. *See United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006); *cf. Direct Sales Co. v. United States*, 319 U.S. 703, 714 (1943). Yet just because an agreement can be tacit does not mean that it need not exist. "[M]ere negotiations between drug traffickers will not suffice; the conspirators must actually agree to accomplish an illegal objective or accede to illegal terms that are acceptable to both." *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984); *United States v. Iennaco*, 893 F.2d 394, 398 (D.C. Cir. 1990). A defendant's speech or conduct must show that the defendant knew of the agreement's "essential object" (even if not the details) and agreed to carry out that object. *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) (citation omitted); *Caver*, 470 F.3d at 233.

On rare occasions, though, even an agreement is not enough. Suppose a willing seller and buyer agree to the exchange of drugs for the buyer's use. This sale might look like an agreement to "distribute" (that is, "transfer") drugs from the seller to the buyer in violation of § 841(a)(1). But that conclusion would turn every drug deal into a drug conspiracy between buyer and seller. And while a drug purchase for personal use is generally a misdemeanor, 21 U.S.C. § 844(a), the buyer could be charged with a felony drug conspiracy too. *See United States v. Parker*, 554 F.3d 230, 234–35 (2d Cir. 2009); *cf. Abuelhawa v. United States*, 556 U.S. 816, 821–23 (2009).

Circuit courts have resoundingly rejected this result. All have adopted some form of a "buyer-seller" rule that refuses to equate a buyer-seller agreement with a conspiratorial "agreement." *See United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020); *United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir. 1977); *see also United States v. Shelledy*, 961 F.3d 1014, 1019 (8th Cir. 2020); *Loveland*, 825 F.3d at 559–63; *United States v. Gallegos*, 784 F.3d 1356, 1360 (10th Cir. 2015); *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc); *United States v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010); *Hackley*, 662 F.3d at

679–80; *Parker*, 554 F.3d at 234–36; *United States v. Gibbs*, 190 F.3d 188, 197–200 (3d Cir. 1999); *United States v. Mercer*, 165 F.3d 1331, 1335 (11th Cir. 1999) (per curiam); *Moran*, 984 F.2d at 1302.

Yet what is the basis "for excluding such buyer-seller cases from the definition of conspiracy"? *Moran*, 984 F.2d at 1302. Despite the judicial consensus in favor of the exception, its source remains "[s]urprisingly" murky. *Id.* Is it a policy exception protecting drug users? Or does it have a source in the text of § 846? We think the latter: When a statute uses a common-law word ("conspire"), courts assume that the word comes with its common-law concepts. *Shabani*, 513 U.S. at 13–14; *see Neder v. United States*, 527 U.S. 1, 21–22 (1999). And a common-law rule of conspiracy (Wharton's Rule) holds that two parties cannot conspire to commit a substantive crime when the crime *itself* requires two parties for its completion (such as dueling or prostitution). *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc) (plurality opinion). As stated by the treatise from which the rule takes its name, "[a]n agreement between two persons to commit an offense does not constitute conspiracy when the target offense is so defined that it can be committed only by the participation of two persons." 4 Charles E. Torcia, *Wharton's Criminal Law* § 684 (15th ed.), Westlaw (database updated Aug. 2020).

The Supreme Court has told courts to presume that Wharton's Rule applies to a conspiracy statute unless the text suggests otherwise. *Iannelli*, 420 U.S. at 786. This presumption grounds the buyer-seller exception in a traditional conspiracy rule (and canon of construction) because the underlying crime of distribution entails the "actual, constructive, or attempted transfer" from one party to another. 21 U.S.C. § 802(8), (11); *United States v. Renfro*, 620 F.2d 569, 575 n.5 (6th Cir. 1980). Understanding this source for the buyer-seller exception can also help us apply it in a principled way. Wharton's Rule shows, for example, that the buyer-seller exception might be "better named the 'transferor-transferee' exception" because its logic extends to any agreement (monetary or nonmonetary) the criminal object of which is a distribution from one person to the other. *Parker*, 554 F.3d at 235 n.3. (The distribution statute, § 841(a)(1), does not require a sale. *See United States v. Wallace*, 532 F.3d 126, 129 (2d Cir. 2008) (citing cases).)

Wharton's Rule also shows the buyer-seller exception's narrow domain. It requires only "an agreement to commit some other crime beyond the crime constituted by the agreement itself." *Lechuga*, 994 F.2d at 349 (plurality opinion); 4 Torcia, *Wharton's Criminal Law* § 684. So, for example, if two sellers cooperate to arrange a drug deal with a buyer, their agreement makes out a conspiracy even if they agree to just one sale. *See United States v. Price*, 258 F.3d 539, 544–46 (6th Cir. 2001). The agreement between the sellers is distinct from the crime that is their object (the distribution to the buyer). Likewise, a seller and buyer might agree not just to a transfer between them; they might agree to "other transfers, whether by the seller or by the buyer." *Parker*, 554 F.3d at 235. Distribution schemes often involve "chain" conspiracies in which a wholesaler sells to a retailer and the two have reached an agreement that the retailer will resell to end users. *See United States v. Henley*, 360 F.3d 509, 513–14 (6th Cir. 2004). Here too, the wholesaler-retailer exchange is distinct from the agreement that is the conspiracy's ultimate criminal object (the resale to the retailer's end users). *See id.*; *see also Direct Sales*, 319 U.S. at 711–15.

2. *What evidence permits a jury to find more than a buyer-seller agreement?* As with many crimes, the government often will not have direct evidence of a conspiracy. It thus may rely on circumstantial evidence to prove that a defendant agreed to distribute drugs with at least one other person. *Hamm*, 952 F.3d at 736. But what evidence suffices? Because a transferor-transferee agreement does not qualify as a conspiracy, that exchange "is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." *See id.* (quoting *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991)).

Our cases have, however, identified additional "factors" that allow a jury to find an agreement between a buyer and seller to go beyond their own sale. *United States v. Deitz*, 577 F.3d 672, 680–81 (6th Cir. 2009). Unlike some courts, *Loveland*, 825 F.3d at 562–63; *Johnson*, 592 F.3d at 755, we have held that a jury can infer a broader agreement if a buyer makes "repeated purchases of large quantities of drugs" from a seller, *United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011). Our cases reason that these purchases allow a jury to conclude that the buyer and seller have reached a tacit agreement for the buyer to resell the drugs

to downstream customers.  *See United States v. Castro*, 960 F.3d 857, 865 (6th Cir. 2020); *United States v. Martinez*, 430 F.3d 317, 333 (6th Cir. 2005); *United States v. Anderson*, 89 F.3d 1306, 1311 (6th Cir. 1996); *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir. 1986).

Other times, we have considered the method of payment for the buyer-seller transaction. A supplier often "fronts" drugs to a distributor through a sort of illegal consignment—in which a supplier gives the drugs on credit and the distributor generates the money to repay the supplier by selling the drugs to others.  *See Robinson*, 547 F.3d at 641; *Henley*, 360 F.3d at 514.  Because the supplier and distributor have agreed that the distributor will resell the drugs to satisfy the debt, that arrangement shows a resale agreement beyond their own exchange.  *Gibbs*, 190 F.3d at 199–200.  In other words, the seller is relying on the success of the buyer and has a stake in the buyer's successful resales.  *See id.* at 200.

Still other times, we have considered evidence of an "enduring arrangement" suggesting that the buyer and seller have agreed to work toward a general distribution end.  *United States v. Layne*, 192 F.3d 556, 568 (6th Cir. 1999).  Their interactions might continue for a long time or reveal a level of trust that is unusual for a buyer-seller relationship alone.  *See United States v. Thompson*, 758 F. App'x 398, 407 (6th Cir. 2018).  A seller might, for example, teach the buyer how to "cut" the drugs to increase the number of doses that can be resold.  *See id.* at 406–07. Or the seller and buyer might engage in "standardized" transactions, acting with a level of efficiency more inherent in a vertically integrated enterprise than in random "spot" sales. *See United States v. Thornton*, 822 F. App'x 397, 406 (6th Cir. 2020); *see also Townsend*, 924 F.2d at 1394–95.

At day's end, whether an illegal agreement exists will turn on all of the circumstances. Yet the question's fact-specific nature should not make us lose sight of a critical element: that the conspiracy involve more than an agreement to transfer drugs from one party to another.

B

Measured against these standards, Wheat's conspiracy conviction cannot stand.  To be sure, the government presented a "slam-dunk" case that Wheat committed a crime: He distributed a heroin sample to Reels in violation of 21 U.S.C. § 841(a)(1).  *United States v.*

*Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (per curiam). But it did not charge Wheat with distributing to Reels; it charged him with conspiring with Reels. *Cf. id.* at 744–45. And under the buyer-seller exception, Wheat's agreement with Reels to transfer the sample between them is not an illegal conspiracy. As noted, the logic of this exception reaches unpaid transfers too. *See Parker*, 554 F.3d at 235 n.3. The government thus needed to prove that Wheat and Reels knowingly agreed to accomplish another crime. It proposes two theories. The government argues that it proved an agreement for Wheat to sell Reels heroin in the future. It next argues that it at least proved an agreement for Reels to redistribute the sample to a "sampler." We take these theories in turn.

Start with the broader theory: that Wheat and Reels agreed that Wheat would sell Reels heroin in the future. Recall that the evidence of their drug-related interactions consists almost entirely of their phone call before the exchange of the heroin sample and that exchange itself. All agree that the government lacks evidence connecting Wheat to Reels's drug dealing before Wheat initiated their call. All also agree that it lacks evidence that Wheat later sold any heroin to Reels, let alone distribution-level amounts. And all agree that it lacks evidence that they even spoke again after exchanging the sample.

This evidence would allow a rational jury to conclude that Wheat and Reels *negotiated* a future drug deal, not that they *agreed* on one. *Pennell*, 737 F.2d at 536; *see Iennaco*, 893 F.2d at 398. As the government's expert explained, drug sellers give samples to buyers to see if they "like[] the drugs" and help them decide whether "to purchase more." Lajack Tr., R.226, PageID#2233. It is not all that unlike Costco offering customers, say, a free taquito sample. Would anyone infer (beyond a reasonable doubt, no less) that a customer has agreed to buy a bulk package of taquitos merely from the decision to try the sample? The government's expert added that Reels had been "shopping around" for samples from several sources, "just like if you were buying a car, you are going to go get the best price and the best car for your dollar, and that's exactly what he's doing here[.]" *Id.*, PageID#2280. Does his receipt of the other samples show an agreement to buy from the other sources too? Consider also that Reels's "sampler" (Carl Mileca) rated Wheat's sample below another recent one. Why would Reels agree to the second-best "product"? In short, "[p]roof of mere negotiations" does not prove a conspiracy.

*Pennell*, 737 F.2d at 536. And the government identifies "nothing but speculation" that the parties ever passed this negotiations phase. *United States v. Ledbetter*, 929 F.3d 338, 359 (6th Cir. 2019).

Admittedly, parties may sometimes reach a *conditional* agreement to engage in a drug transaction subject to, say, the buyer testing the quality of the drugs. As the First Circuit has noted, an "agreement to buy that is conditional is nonetheless for conspiracy purposes an agreement to buy, at least as long as the potential buyer believes the condition likely to be fulfilled." *United States v. Anello*, 765 F.2d 253, 262 (1st Cir. 1985) (Breyer, J.). Here, however, the government identifies no evidence that Wheat and Reels agreed on such things as "quantity," "price," or anything else. *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988); *see also Iennaco*, 893 F.2d at 398. It also cites no case upholding a finding of a conditional agreement based on the exchange of a sample alone. In all events, even if Wheat and Reels had reached a conditional agreement for a future drug sale, that fact alone would still just establish a buyer-seller relationship.

Turn to the government's narrower theory: that Wheat and Reels agreed to redistribute the sample to a third-party sampler. This theory at least avoids the buyer-seller exception because the two would have agreed to a crime (distribution to the sampler) that is distinct from their own illegal exchange. *Cf. Lechuga*, 994 F.2d at 350 (plurality opinion). Reels also quickly gave Wheat's sample to Mileca. According to the government's expert, moreover, dealers like Reels typically use third parties to test samples (rather than test them themselves). This claim thus presents a closer question.

Still, Wheat must have *knowingly agreed* that Reels would transfer his sample to a third party in order to turn their two-person distribution into a conspiracy whose "essential object" was this redistribution. *Christian*, 786 F.2d at 211 (citation omitted). Yet the government presented no evidence that Wheat and Reels expressly agreed to such a criminal objective. Nothing in their recorded conversations mentions a third-party sampler. When testifying at trial, moreover, Reels did not claim that he had orally agreed with Wheat to a "plan" in which he would test the drug by giving it to Mileca.

The government thus must argue that Wheat's conduct shows a "tacit" agreement that Reels would give the sample to a third party—like, say, the tacit agreement that exists when a conspirator carries a firearm to protect another conspirator who sells drugs. *See United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994). Here too, however, the government points to no Wheat-specific evidence that he knew of Reels's plan to redistribute the sample, let alone agreed to it. Its expert conceded that Wheat did not know of Mileca or his calls with Reels about samples. Likewise, Reels testified that he did not share a lot about himself with Wheat. Reels and Wheat also did not know each other well, having previously seen each other only about once a year on social occasions. And Reels never called Wheat back to share Mileca's "feedback" on Wheat's sample.

At bottom, the government's theory requires us to adopt the general rule that a defendant's delivery of a sample to a known drug dealer *always* suffices, without more, for a finding that the two knowingly conspired to redistribute the sample to a third party. Yet, unlike with a "fronting" transaction in which the parties exchange drugs for a specific resale purpose, such a redistribution is not inherent in the exchange of a sample. For all Wheat cared, Reels would try the sample himself or test it in other ways. The evidence suggests no more than that Wheat was "indifferent" as to the ways that Reels might test the sample (some of which could involve a redistribution and others not). *See Parker*, 554 F.3d at 236. Without some (minimal) evidence that Wheat knew of and intended for a further distribution, a rational jury could not find an agreement with that criminal objective beyond a reasonable doubt. *Cf. United States v. Shull*, 349 F. App'x 18, 20–21 (6th Cir. 2009); *United States v. Morrison*, 220 F. App'x 389, 396 (6th Cir. 2007); *United States v. Coppin*, 1 F. App'x 283, 291–92 (6th Cir. 2001); *United States v. Pearce*, 912 F.2d 159, 161–62 (6th Cir. 1990); *see also United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005).

Our factors for distinguishing a distribution conspiracy from a buyer-seller transaction reinforce this conclusion. *See Deitz*, 577 F.3d at 680–81. Did Reels make "repeated purchases of large quantities of drugs" from Wheat? *Sills*, 662 F.3d at 417. No, Reels made no purchases and received just one sample. Did the method of payment for the .3 grams of heroin suggest a level of trust between Wheat and Reels? *Robinson*, 547 F.3d at 641. No, parties exchange

samples precisely because the potential purchaser does not trust the potential supplier. Did Wheat have any "enduring arrangement" with Reels? *Layne*, 192 F.3d at 568. No, the two barely knew each other and had only this one drug-related interaction.

So what might explain the conviction in this case? We see one possibility: The jury instructions gave little indication that Wheat's agreement with Reels to exchange the sample did not *itself* suffice to prove a conspiracy. The instructions defined a conspiratorial agreement as "two or more persons conspir[ing], or agree[ing], to distribute or possess with intent to distribute controlled substances," and they defined "distribute" as transferring a drug "to the possession of another" with or without an exchange of money. Tr., R.227, PageID#2489, 2492. The jury thus may have thought it could find a conspiracy if it found that Wheat and Reels knowingly agreed to transfer the sample from one to the other. We generally will not reverse a district court for failing to give an instruction on the buyer-seller limitation (and it does not appear that Wheat's counsel requested such an instruction here anyway). *See, e.g.*, *United States v. Musick*, 291 F. App'x 706, 729–30 (6th Cir. 2008); *cf. United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015). But we cannot ignore this buyer-seller rule when we ask whether there was enough evidence for all essential elements of the crime. *Cf. Musacchio v. United States*, 136 S. Ct. 709, 715 (2016).

In response, the government cites *Price* for the proposition that even "a single sale can be sufficient to establish a conspiracy." 258 F.3d at 545. That principle does not help the government. *Price* shows why. There, the defendant agreed with his girlfriend that she would front him drugs to sell to a third party. *Id.* at 542–43. We held that this evidence avoided the buyer-seller exception. *Id.* at 544–46. The defendant and his girlfriend had reached an agreement between them that was separate from their criminal goal (the defendant's sale to the third party). *Id.*; *see also Renfro*, 620 F.2d at 575 & n.5. Here, by contrast, there is insufficient evidence of any agreement between Wheat and Reels *beyond* their own exchange of the sample.

For decades, jurists have expressed concern about the "elastic, sprawling" nature of the crime of conspiracy and "the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself[.]" *Krulewitch v. United States*, 336 U.S. 440, 447 (1949) (Jackson, J., concurring); *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.) (Hand., J.), *aff'd* 311 U.S. 205

(1940). Charging a substantive crime allows the government to punish the defendant for that crime; charging a conspiracy allows the government to punish the defendant for other crimes within its scope. *See Hamm*, 952 F.3d at 744; *Townsend*, 924 F.2d at 1388–90. The drug-conspiracy requirement that two parties must agree to a crime beyond their own exchange of drugs distinguishes an illegal conspiracy from an illegal distribution and ensures that the jury will not infer a conspiracy "based on guilt of" the distribution alone. *Hackley*, 662 F.3d at 681. Because the evidence suggests that the jury did so in this case, we reverse Wheat's conspiracy conviction.

## III

The sufficiency of the evidence for Wheat's communication-facility conviction is another matter. *See* 21 U.S.C. § 843(b). Section 843(b) makes it "unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter[.]" *Id.* Section 843(b)'s text requires a defendant to have used a "communication facility," which the statute defines to include a telephone. *Id.* We have also read the text to require that the defendant or another person actually commit the underlying drug felony that serves as the basis for the communication-facility charge. *United States v. Dotson*, 871 F.2d 1318, 1321–22 (6th Cir. 1989); *see also Iennaco*, 893 F.2d at 396. But the underlying drug felony can be a conspiracy or attempt. *United States v. Freeman-Payne*, 626 F. App'x 579, 584 (6th Cir. 2015); *United States v. McGhee*, 854 F.2d 905, 908 (6th Cir. 1988); *see also United States v. Briscoe*, 896 F.2d 1476, 1510–11 (7th Cir. 1990). And the defendant's use of a phone need only facilitate (that is, "make easier") the underlying drug felony. *See United States v. McLernon*, 746 F.2d 1098, 1106 (6th Cir. 1984); *see also United States v. Watson*, 594 F.2d 1330, 1343 (10th Cir. 1979). (That said, a buyer does not violate § 843(b) by using a phone to arrange a drug transaction for the buyer's personal use because that type of purchase is only a misdemeanor. *See Abuelhawa*, 556 U.S. at 824.)

Plenty of evidence proves these elements in this case. Wheat does not dispute that he knowingly used his phone: He sent his phone number to Reels and later spoke with Reels over the phone the night before their exchange of the heroin sample. During the call, Wheat alerted

Reels of the heroin that he had come across and arranged for a meeting with Reels to exchange that sample. A rational jury thus could find that Wheat knowingly used his phone to make it easier to distribute the sample to Reels (in violation of § 841(a)(1)) and to attempt a larger heroin sale to him (in violation of § 846).

Wheat has a two-fronted response. He first argues that this communication-facility conviction necessarily fails if we overturn his conspiracy conviction because the jury instructions listed the conspiracy as a potential predicate felony for the communication-facility offense. Yet our sufficiency-of-the-evidence review does not assess the evidence against the jury instructions; it assesses the evidence against the legal elements. *See Musacchio*, 136 S. Ct. at 715. And regardless, we may uphold a general verdict that could have rested on two independent evidentiary grounds as long as sufficient evidence existed for one of the grounds. *See Griffin v. United States*, 502 U.S. 46, 49–60 (1991). Here, the jury instructions alternatively explained that the jury could convict Wheat if it found that his phone use facilitated the attempted distribution of drugs. Wheat makes no claim that there was insufficient evidence to prove such a criminal attempt. *See Johnson*, 592 F.3d at 759.

Wheat next argues that he used his phone merely to organize the exchange's "logistics," not to conceal the crime (by, for example, switching among multiple phones or changing phone numbers). He fails to explain why this fact matters. Section 843(b)'s text does not require that the phone conceal the crime; it requires that the phone facilitate it. And courts regularly hold that a phone makes a drug-distribution crime easier where, as here, the defendant uses the phone to coordinate the logistics of the distribution. *See, e.g.*, *United States v. Haines*, 803 F.3d 713, 736–37 (5th Cir. 2015); *United States v. Miller*, 738 F.3d 361, 378 (D.C. Cir. 2013); *United States v. McGee*, 408 F.3d 966, 986 (7th Cir. 2005). The statute requires nothing more.

\* \* \*

The parties have not briefed how a reversal of Wheat's conspiracy conviction affects his guidelines range (if at all). Before considering his sentencing claims, therefore, we will allow the district court to reconsider the proper sentence for Wheat based on his communication-

facility conviction alone. *See Shull*, 349 F. App'x at 22. We reverse Wheat's conspiracy conviction, affirm his communication-facility conviction, and remand for resentencing.