NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0508n.06

Case No. 20-6167

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**FILED**
11/08/2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JACKSON NOEL, | ) | KENTUCKY |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

Before: SUTTON, Chief Judge; McKEAGUE and WHITE, Circuit Judges.

SUTTON, Chief Judge. A jury convicted Jackson Noel of conspiring to distribute oxycodone and oxymorphone in connection with the operation of his pharmacy in rural West Virginia. Noel appeals his conviction, challenging the admission of other-acts evidence at trial and the sufficiency of the evidence. We affirm.

I.

This alleged "chain conspiracy" involved three key players: Jackson Noel, Darryl Williams, and Dr. Joel Smithers. Jackson Noel started working for a retail pharmacy chain in West Virginia in 1990. In 2011, he opened his own shop in Buffalo, West Virginia. As the pharmacist in charge at Buffalo Drug, Noel decided whether the pharmacy should fill a given prescription.

Drug Enforcement Administration agents began investigating Noel's pharmacy after receiving information from Darryl Williams about his connections with the pharmacy.

Williams admitted to law enforcement that he distributed drugs and agreed to cooperate with them. In his telling, he arranged and paid for individuals from Kentucky to obtain and fill prescriptions for controlled substances. In return, he received half of the pills obtained. Williams would keep some for personal use and sell the rest at hefty profits.

Federal agents identified Dr. Joel Smithers, a physician in Martinsville, Virginia, as the key source of opioid prescriptions written for Williams's drug trafficking operation. When Williams first went to see Dr. Smithers, he told the doctor he "could get him a lot of clients." R.150 at 5. At trial, Williams identified 12 of these clients by name. During a typical visit to Dr. Smithers's office, a client would sit in the waiting room for a long time before seeing Dr. Smithers for "just a few minutes." *Id.* at 10. Medical exams were perfunctory or non-existent. Dr. Smithers would ask clients what medication they took, then write a prescription for whatever they told him. Members of Williams's organization preferred large quantities of oxycodone and oxymorphone, both Schedule II controlled substances. 21 C.F.R. § 1308.12(b)(1).

The Williams operation eventually had trouble filling prescriptions that Dr. Smithers wrote. As Williams put it, he tried "every Walgreen, Rite Aid, Walmart, [and] CVS from Martinsville, Virginia, to Louisville, Kentucky." R.150 at 12. When he raised this issue with Dr. Smithers, the doctor told him to go see Jackson Noel at Buffalo Drug. Buffalo Drug before long became one of three primary pharmacies Williams's organization used to fill prescriptions from Dr. Smithers. All told, Noel filled 192 prescriptions that Dr. Smithers wrote for identified members of the Williams operation.

Agents executed a search warrant at Buffalo Drug, seizing records of prescriptions filled at the pharmacy for oxycodone, oxymorphone, and other Schedule II controlled substances between June 2015 and April 2017. Many prescriptions contained anomalies that suggested illegitimate prescription practices and drug diversion. Some of the red flags included prescriptions from out-of-state doctors, prescriptions being written for and filled by far-away, out-of-state patients, payments at inflated prices, high doses of opioids, and patients traveling long distances or in groups to obtain and fill prescriptions. Many members of Williams's organization lived near Stone, Kentucky. Yet Smithers operated out of Martinsville, Virginia, 250 miles away. Noel's West Virginia pharmacy was not close either: 252 miles from Martinsville and 115 miles from Stone.

A grand jury charged Noel with conspiring to dispense and distribute oxycodone and oxymorphone between June 2015 and December 2016. 21 U.S.C. § 846. The government argued at trial that Noel conspired with Dr. Smithers, Williams, and those whom Williams sponsored to divert prescription drugs in exchange for cash. The jury found Noel guilty, and the district court sentenced him to 120 months.

## II.

*Admission of other-acts evidence*. Noel contends that the district court wrongly admitted evidence related to prescriptions, prescribers, and patients outside of the charged conspiracy, all in violation of Evidence Rule 404(b). The rule prohibits the admission of other acts when used to prove that a person acted "in accordance with the character" demonstrated by those other actions. Fed. R. Evid. 404(b)(1). But the rule permits such evidence when used for "another purpose," such as proving "intent," "knowledge," or "absence of mistake," *id.* 404(b)(2), and it permits a party to introduce such evidence to counter a defense that a defendant did not mean to violate a

criminal law, *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994). To convict Noel of conspiring to distribute controlled substances, the government had to show that he knowingly agreed to fill prescriptions for oxycodone and oxymorphone outside the usual course of professional practice. *United States v. Veal*, 23 F.3d 985, 987–88 (6th Cir. 1994) (per curiam); *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021).

When deciding whether to admit Rule 404(b) evidence, courts ask if (1) the other acts occurred, (2) the government offered the evidence for a proper purpose, and (3) a danger of unfair prejudice substantially outweighs the probative value of the evidence. *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015). Generally speaking, we review trial-court decisions under Rule 404 for abuse of discretion. *United States v. Mack*, 258 F.3d 548, 553 n.1 (6th Cir. 2001).

A central issue at trial was whether Jackson Noel filled the charged prescriptions innocently or knew that in filling them he acted outside professional norms. The records seized from Noel's pharmacy included prescriptions for controlled substances written by doctors other than Dr. Smithers but bearing similar red flags, including out-of-state patients, inflated payments, and high doses of opioids. Government witnesses testified that 11 of these medical professionals were under investigation by the Drug Enforcement Administration. The government used this evidence, which tended to show a calculated approach to fill prescriptions with red flags suggestive of drug trafficking, to combat Noel's defense that "slick" drug dealers duped him, and that he had no idea he supplied drugs for a trafficking organization. R.152 at 125.

The trial court "permissibly exercise[d] its discretion within the boundaries of" Rule 404(b) in admitting this evidence. *United States v. Tasis*, 696 F.3d 623, 628 (6th Cir. 2012). The court allowed it only to show Noel's intent, knowledge, and absence of mistake in joining a conspiracy to dispense oxycodone and oxymorphone outside the usual course of professional practice. A

complete understanding of the broader set of prescriptions seized from Noel's pharmacy was relevant to the jury's consideration of the conspiracy charge because the evidence was probative of whether Noel knew that the filled prescriptions for Williams's operation went well beyond professional norms. The court admitted the evidence only after determining that any danger of unfair prejudice did not outweigh its probative value. And it mitigated the potential unfair prejudice of the evidence by instructing the jury not to consider it for improper purposes and by limiting the government's discussion of individuals outside the charged conspiracy. *See United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996). Given the court's careful consideration of the admissibility of the challenged evidence and its multiple instructions on the limited purpose for which the jury could consider the evidence, we cannot say that the court abused its discretion.

Noel offers three counterarguments. He first contends that some of the other-acts evidence constituted inadmissible hearsay. As for the admission of Noel's business records, he failed to raise a hearsay objection at trial or during a pretrial conference, and he has not convincingly argued that the prescriptions did not, in fact, become part of his business records. Further, the government used them simply to show that Noel dispensed controlled substances prescribed by doctors other than Dr. Smithers. As for the testimony by employees of the Drug Enforcement Administration, they spoke based on personal knowledge that Noel filled prescriptions written by doctors under investigation by the agency, disproving the hearsay allegation. At all events, Noel never objected to their testimony on this basis at trial, and he cannot remotely show its admission amounted to plain error. Nor did Noel raise a hearsay objection when a pharmacy board investigator testified, again based on personal knowledge, that authorities had suspended several of the doctors' licenses. No plain error occurred on this score either.

Noel next argues that the government introduced the evidence for an impermissible purpose. But a central issue at trial—indeed Noel's key defense—concerned his intent. We do not mark a new path in allowing a court to admit other-acts evidence under Rule 404(b) to prove intent. *Carter*, 779 F.3d at 625. To determine whether the evidence bears on intent, "we look to whether the evidence relates to conduct that is substantially similar and reasonably near in time to the specific intent offense at issue." *Id.* (quotation omitted). This evidence fits that bill. Noel's other acts were substantially similar to the charged offense because they involved filled prescriptions bearing red flags similar to those Dr. Smithers wrote. These acts were "sufficiently analogous to support an inference of criminal intent." *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988). And the prescription records, which ranged from June 2015 to April 2017, were reasonably near in time to, and largely coincided with, the charge that the conspiracy lasted between June 2015 and December 2016. *See United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir. 1985).

*United States v. Jones* does not alter this conclusion. 570 F.2d 765 (8th Cir. 1978). It held that the trial court erred in admitting hundreds of prescriptions written by the defendant beyond the direct charge of *twice* prescribing a drug outside the usual course of professional practice. *Id.* at 766, 768. It was not a conspiracy case. And the government obtained testimony that some of the patients named in those hundreds of prescriptions had narcotics addictions, but it failed to introduce "other proof that the prescriptions had not been issued for a proper medical purpose." *Id.* at 768. Without more, the government failed to show that the defendant "acted unprofessionally" in filling the prescriptions, and the evidence did not show intent to commit the charged offenses. *Id.*

Today's other-acts evidence went beyond allegations that Noel filled prescriptions for drug addicts, and the government used it to show a conspiracy, not to show that two prescriptions exceeded professional norms. The evidence showed multiple red flags: prescriptions written for and filled by out-of-state patients, non-insurance payments at inflated prices, high doses of opioids, and patients traveling long distances to fill prescriptions. Those red flags "support a reasonable inference that the underlying prescriptions" were filled "outside the usual course of professional practice." *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020). And a jury could find this other-acts evidence probative of Noel's intent to conspire to dispense oxycodone and oxymorphone illegally when he filled prescriptions written by Dr. Smithers bearing similar red flags, undermining his defense that he acted only negligently in agreeing to fill those prescriptions. *See id.*; *United States v. Brown*, 553 F.3d 768, 789–90 (5th Cir. 2008); *United States v. Lasher*, 661 F. App'x 25, 28 (2d Cir. 2016).

That the government did not offer expert testimony to confirm that Noel acted outside professional norms when he filled the other-acts prescriptions does not make the evidence inadmissible. Understanding whether someone acted in the usual course of professional practice, we appreciate, sometimes requires expert testimony. But at the same time there are plenty of situations in which "the lay testimony is so clear that no expert testimony is required." *United States v. Elliott*, 876 F.3d 855, 865 (6th Cir. 2017) (quotation omitted). The lay testimony and evidence of red flags here sufficed "to support a finding by the jury that" Noel committed the allegedly similar other acts. *See Huddleston v. United States*, 485 U.S. 681, 685 (1988).

Noel adds that the prejudicial effect of the other acts substantially outweighed any probative value. A trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Recognizing the trial court's

ring-side view of the proceedings, we grant it wide discretion in making that call. *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989). No abuse of discretion occurred. The evidence was probative. It illustrated a calculated scheme on Noel's part to insist on inflated non-insurance payments (usually in cash) when filling prescriptions for high doses of controlled substances written for out-of-state patients, contrary to his defense that he negligently filled prescriptions for members of Williams's operation. We appreciate that the government's introduction of evidence that Noel filled prescriptions written by other doctors under federal investigation creates a risk of prejudice, one that district courts must take seriously. But that risk was not unfair in this case. To its credit, the district court also sought to mitigate the risk by issuing limiting instructions requiring the jurors to consider this evidence to determine only whether Noel "had the intent to commit the alleged crime." R.150 at 225; *see also id.* at 230; R.149 at 60; R.153 at 82. The district court's consideration of this issue reveals a careful and acceptable use of its broad discretion, not an abuse of it.

*Sufficiency of the evidence*. The drug laws make it unlawful to distribute a controlled substance knowingly or intentionally. 21 U.S.C. § 841(a)(1). The prohibition does not apply to pharmacists as long as their actions fall within the usual course of professional practice. *United States v. Moore*, 423 U.S. 122, 124 (1975). A pharmacist thus violates this drug-distribution prohibition if he knowingly fills a controlled substance prescription issued outside professional norms. *Veal*, 23 F.3d at 988.

The government charged Noel with conspiring to violate § 841(a)(1). *See* 21 U.S.C. § 846. To convict Noel of that offense, the government had to show that two or more people agreed to distribute controlled substances outside the usual course of professional practice, and that Noel knowingly and voluntarily joined that agreement. *See Wheat*, 988 F.3d at 306. The requisite

8

agreement "can be an unspoken 'meeting of the minds' that two or more people will jointly achieve a drug-distribution end." *Id.* at 306–07. In a chain-distribution conspiracy, like the one charged here, an agreement may "be inferred from the interdependent nature of the criminal enterprise." *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (quotation omitted). It suffices for the government to show that a defendant "realized that he was participating in a joint venture." *United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008) (quotation omitted).

In assessing a sufficiency challenge, we ask whether, after construing all evidence in favor of the verdict, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Ample evidence supports the jury's verdict.

As for the existence of an agreement, Williams told Smithers that he "could get him a lot of clients." R.150 at 5. Smithers then charged cash to write prescriptions for out-of-state clients for large quantities of controlled substances without conducting proper medical examinations. He even wrote some prescriptions without seeing the patients. When Williams complained that pharmacies would not fill the prescriptions, the doctor told him to "see Jackson at Buffalo Drug." *Id.* at 12. As predicted, Jackson Noel then filled 192 prescriptions that Smithers wrote for identified members of Williams's operation, even though Smithers's office was 252 miles away from Buffalo. Williams's operation could not succeed without a doctor willing to issue illegitimate prescriptions and a pharmacist willing to fill the prescriptions, making the enterprise highly interdependent. A rational jury could infer at a minimum that an unspoken meeting of the minds arose between Dr. Smithers, the Williams operation, and Noel to distribute drugs outside customary professional practices.

As for knowing participation, Noel knew that "a good number" of the people bringing prescriptions from Smithers had been patients of a pain clinic that the State had shut down. R.152 at 110–11. He knew they were coming from a considerable distance, "Southeast Kentucky," to fill prescriptions for high doses of oxycodone and oxymorphone written by an out-of-state doctor. *Id.* at 112–13. Dr. Smithers told Noel that his clients had trouble filling prescriptions. That did not stop Noel. He simply charged them as much as ten times what the drugs normally cost and refused to accept insurance. At times, he filled prescriptions written for members who were not present. And on several occasions, Noel filled nearly identical prescriptions for members of Williams's organization within minutes of each other. Noel did all of this on a "[n]o questions asked" basis. R.150 at 15. Noel in short did not slow down when he saw these red flags. To the contrary, he continued apace and even admitted that he "shouldn't have filled" the prescriptions for Williams's operation. R.152 at 131. A rational jury could find that Noel knew he was involved in a joint venture to distribute drugs outside the usual course of professional practice.

Noel raises two counterarguments. He claims that the government failed to show that Dr. Smithers issued prescriptions outside professional norms because it failed to present expert testimony on the issue. But, as noted, there are plenty of situations in which "the lay testimony is so clear that no expert testimony is required." *Elliott*, 876 F.3d at 865. That is this case. Dr. Smithers charged cash to write prescriptions for large quantities of controlled substances to customers coming from 250 miles away without conducting proper medical examinations. He even shipped prescriptions to Williams when bad weather prevented members of the organization from traveling. This evidence sufficed to show that Smithers prescribed controlled substances outside professional customs. *See id.*

Noel next argues that, even if the government's red-flag evidence suggests that he dispensed opioids to patients outside pharmacy conventions, a buyer-seller agreement by itself does not necessarily "qualify as a conspiracy." *Wheat*, 988 F.3d at 308. Fair enough. That may be true in some settings. But in other settings, including this one, a jury could infer a conspiratorial agreement between a buyer and seller when the evidence shows repeated purchases of large quantities of drugs. *Id.* Several members of Williams's organization visited Buffalo Drug to fill prescriptions for large quantities of controlled substances on multiple occasions, some doing so as many as six times. That suffices.

We affirm.