NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0441n.06

No. 21-6012

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Nov 01, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) ) | |
| ERIC CAIN, | ) ) | OPINION |
| Defendant-Appellant. | ) ) ) | |

Before: GUY, WHITE, and LARSEN, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Eric Cain was sentenced to 126 months in prison after a jury convicted him of several charges arising from the sale of methamphetamine. He appeals two of the convictions, challenging the sufficiency of the evidence and adequacy of the jury instructions. He also appeals his sentence, asserting a Guideline scoring error and substantive unreasonableness. We AFFIRM.

## I.

In the summer and fall of 2018, Cain sold methamphetamine on numerous occasions to Michelle Gilley, who sold the methamphetamine to other buyers. Gilley sold methamphetamine to a confidential informant in November 2018 and was charged with drug trafficking. She cooperated and became an informant herself. [She told police about Cain, who had previously been unknown to law enforcement, as well as several others from whom she had bought or to whom she had sold drugs. Police in Florence, Kentucky, opened an investigation into Cain that later became a joint investigation with the Drug Enforcement Agency ("DEA").

Florence Police Officer Ben Kolkmeier developed a plan for Gilley to conduct a controlled buy from Cain. On November 27, 2018, during a meeting between Kolkmeier and Gilley to review the plan and formally sign Gilley up as a cooperator, Cain called Gilley unexpectedly. Gilley answered the call using her phone's speaker function, and Kolkmeier recorded the conversation. Cain described a new blend he was considering selling: a mix of pink heroin or fentanyl (what he called "Pepto Bismol") and methamphetamine. Cain asked if people would like it. Gilley replied that they would, but it could kill people. Based on this call between Cain and Gilley, law enforcement decided to have Gilley arrange a purchase of methamphetamine and a sample of the pink mixture. Law enforcement directed Gilley to purchase fifty-six grams of methamphetamine for $1,100 and a $40 Pepto sample.

The controlled buy took place on the evening of December 4, 2018. Earlier in the day, Cain texted Gilley saying he would combine some fentanyl with the Pepto mixture, but Gilley said she did not like fentanyl, so he kept her Pepto separate. Cain later texted that he had to get more product because he "ran out," explaining that "everyone wanted half[]" ounces, so he had to meet "with the guy" to get more. Gilley replied that she had a customer waiting and asked him to hurry.

When it came time for the controlled buy, Officer Kolkmeier met Gilley around 4:30pm near her house, along with Officer Joseph Schulkens, a Florence police officer assigned to the DEA as a task-force officer. The officers drove Gilley to a church parking lot close to another parking lot chosen for the drug transaction. Kolkmeier patted Gilley down to check for weapons and searched her pockets to check for drugs and found none. The officers gave Gilley $1,140 in cash with recorded serial numbers. They also put a wire on her to listen during the controlled buy.

While waiting for Cain to arrive, Gilley communicated with him by phone and text as the officers monitored. Gilley complained when Cain pushed back the meeting time, and Cain replied:

"[Y]ou know shit don't always go as planned with this shit." Gilley noted she had $1,100 with her, and Cain said: "Okay, and I realize that and you're making money too, and I'm making money. We both eating . . . You think I want to not make money. I mean come on; it's obvious. I'm pushing as fast as I can, as hard as I can."

Police directed Gilley to walk over to the buy site around 6:30pm as Cain approached, based on information from a GPS tracker on Cain's car. Around this same time, Cain also texted Gilley saying he would soon arrive. When Cain pulled up, there was someone in the passenger seat of his car—his cousin, he told Gilley—though only Cain got out. He hugged Gilley and gave her the drugs, which he retrieved from a box in the vehicle. She then paid him the $1,140. The exchange lasted about fifteen minutes.

During the controlled buy, Officer Kolkmeier remained with Officer Schulkens in Kolkmeier's van. It was dark and they could not see Gilley during the buy, but other officers were positioned in the area so that Gilley was under constant surveillance. Kolkmeier, Schulkens, and the other officers communicated by radio.

Gilley returned to Kolkmeier and Schulkens with two plastic baggies, one containing what was later confirmed to be methamphetamine and the other containing the Pepto sample. The methamphetamine was 98% pure and weighed 55.4 grams. The Pepto sample contained heroin and methamphetamine and weighed .23 grams. Kolkmeier searched Gilley again as he did before, finding she had no weapons or other drugs. The recording from Gilley's device was too muffled to be of use to the officers.

At 6:54pm, Boone County sheriff's deputies stopped Cain's car in Hebron, Kentucky, at which point he was the only person in the vehicle. After leaving the controlled buy, Cain made one brief stop that lasted less than a minute and was then pulled over. The deputies saw a loaded

pistol in a holster on the car's passenger seat; Cain admitted the gun was his. The deputies then detained him. When they asked about the other contents of the car, Cain told them about a box with drugs, which he said he had found and was going to sell for Christmas money. The deputies found a brown box behind the passenger seat containing a pink substance, two baggies of methamphetamine, digital scales, and several clear baggies. Cain had $1,170 on his person, including the pre-recorded bills given to Gilley. The seized methamphetamine was 100% pure and weighed 11.781 grams. The pink substance contained heroin, fentanyl, and methamphetamine and weighed 3.338 grams.

The grand jury returned a six-count indictment, charging: (1) conspiracy to violate the drug laws (21 U.S.C. § 846); (2) and (3) distribution of methamphetamine and heroin (21 U.S.C. § 841(a)(1)); (4) and (5) possession of methamphetamine, heroin, and fentanyl with intent to distribute (21 U.S.C. § 841(a)(1)); and (6) possession of a firearm in furtherance of drug trafficking (18 U.S.C. § 924(c)(1)(A)).

After a three-day trial, the jury found Cain guilty of the first five counts but acquitted him on the firearm count. The district court sentenced Cain to concurrent terms of 126 months in prison for all five counts and five years of supervised release. In scoring the Sentencing Guidelines, the district court applied § 2D1.1(b)(1)'s two-level increase to Cain's base offense level for possessing a firearm.

**II.**

Cain challenges his convictions on two bases: (1) there was insufficient evidence to support the conspiracy and distribution convictions in Counts 1 and 2; and (2) the jury instructions on conspiracy were inadequate.

**A.**

Cain attacks the sufficiency of the evidence on two fronts. He asserts that the evidence does not support the jury's verdicts on Count 1 for conspiracy and Count 2 for distribution because Gilley's testimony was unreliable, and, further, that the evidence on the conspiracy count was insufficient because it showed no more than a buyer-seller relationship between Cain and Gilley. Cain preserved these arguments by moving for a judgment of acquittal at the close of the government's case-in-chief and at the close of all the evidence, so we review both arguments de novo. *United States v. Howard*, 947 F.3d 936, 947 (6th Cir. 2020); *see also United States v. Wilson*, 837 F. App'x 396, 398 (6th Cir. 2020).

In doing so, we ask if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Howard*, 947 F.3d at 947 (quoting *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015)) (emphasis in original). The elements of a conspiracy to sell drugs under 18 U.S.C. § 846 are: "(1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). The elements of distribution of a controlled substance under 21 U.S.C. § 841(a)(1) are: (1) the defendant knowingly or intentionally distributed the controlled substance, and (2) "the defendant knew at the time of distribution that the substance was a controlled substance." *United States v. Godofsky*, 943 F.3d 1011, 1023 (6th Cir. 2019) (quoting Sixth Cir. Crim. Pattern Jury Instr. 14.02(A)).

**1.**

We start with Cain's contention that the jury could not have reasonably relied on Gilley's testimony because it was "inherently unbelievable." Appellant's Br. at 8. "It is well settled in this Circuit that attacks on witness credibility are simply challenges to the *quality* of the government's

evidence and not to the sufficiency of the evidence." *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993) (emphasis in original). "It is equally clear that issues of witness credibility are for the jury." *Id.* Still, "courts need not blindly accept implausible stories swallowed by jurors." *United States v. Caraway*, 411 F.3d 679, 682 (6th Cir. 2005). "[W]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

Cain argues there was reason to question Gilley's credibility. Gilley herself testified that she "spent a life long of deceit, deception, and drug addition and doing things wrong." She admitted that, as a drug addict, she likely lied to the police in the past, and she also admitted to being dishonest with her parole officer and lying to Cain's counsel when he visited her in jail. She sold methamphetamine while on parole. She was evasive with some of her answers—dodging, for example, questions about her past conviction for forgery and her compliance with rules on probation. Moreover, she admitted to having memory problems.

Additionally, Cain points out that the government's ability to corroborate Gilley's testimony was limited. Law enforcement could not clearly observe the controlled buy, and some law-enforcement witnesses inconsistently recounted details of the night. Law enforcement relied on taking pictures of text messages on Gilley's phone rather than taking screenshots on her phone or searching the phone to verify that the messages came from Cain. And law enforcement could not account for Gilley's whereabouts earlier in the day before the controlled buy, and the wire she wore during the buy failed to produce a clear recording.

These arguments fail to persuade. Although Cain shows reasons to doubt Gilley, he cites nothing in the way of "patently incredible" testimony or testimony beyond "physical realit[y]." *See Caraway*, 411 F.3d at 682. To be sure, there were reasons for the jury to question Gilley's

credibility, but there were also many reasons for the jury to believe her testimony. For example, when arrested, Cain had the recorded bills police had given Gilley for the controlled buy, and Cain was recorded calling Gilley to discuss selling drugs. Further, Gilley's past dishonesty did not necessarily show she lied at trial; she explained that when she lied to Cain's counsel, it was because she was nervous and "felt like [she] wasn't supposed to tell [him] anything" as a cooperator. Given this record, we will not overturn the jury's assessment of Gilley's credibility.

**2.**

Cain also argues that the government failed to prove a conspiracy between Cain and Gilley because it did not prove more than a buyer-seller relationship. The Sixth Circuit has "long held that a buyer-seller agreement alone does not establish a 'conspiracy' under" 18 U.S.C. § 846. *United States v. Wheat*, 988 F.3d 299, 304 (6th Cir. 2021). Not every agreement for the sale and purchase of drugs between a buyer and a seller can amount to a conspiracy. *See id.* at 307. In essence, for there to be a conspiracy, the parties must agree "to commit some other crime beyond the crime constituted by the agreement itself"—that is, some crime beyond the sale on its own. *Id.* at 308 (quoting *United States v. Lechuga*, 994 F.3d 346, 349 (7th Cir. 1993) (en banc)). As explained in *Wheat*, "a seller and buyer might agree not just to a transfer between them; they might agree to 'other transfers, whether by the seller or by the buyer.'" *Id.* (quoting *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009)). We consider several factors in evaluating whether a defendant was a co-conspirator, not just a buyer or seller: "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller." *United States v. Castro*, 960 F.3d 857, 865 (6th Cir. 2020) (quoting *United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009)). Further, "evidence of repeat purchases from a single source and large volumes of narcotics creates an

inference of conspiracy." *Id.* (quoting *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014)).

Cain argues "there was no proof that [he] sold drugs to Gilley on credit, that she viewed herself as working for Cain or with Cain, that Gilley and Cain were part of some larger agreement to distribute methamphetamine, or that Cain and Gilley had an agreement to distribute more than 50 grams of crystal methamphetamine." Appellant's Br. at 14–15. He takes aim at a key piece of the government's evidence—Cain's comment to Gilley that "we're both eating"—and tries to spin the comment to mean simply that "he recognized that he profited from the sale of drugs to Gilley and she would profit from her sales to others," showing "approval, not agreement." Appellant's Br. at 15.

Although Cain's interpretation of this comment may be a plausible alternative view, a rational jury could have interpreted the evidence to establish that Cain and Gilley were engaged in a conspiracy to distribute methamphetamine. Gilley had been buying from Cain for months and established a close relationship with him, as demonstrated by the recorded phone call in which he asked her advice about selling the Pepto mixture. The "eating" comment is certainly suggestive of a conspiratorial agreement. Cain said in full: "You're making money too, and I'm making money. We're both eating." This indicates an ongoing relationship in which Cain supplied drugs to Gilley for future distribution by her to others—an arrangement which allowed them both to profit. Gilley also testified that when her prior dealer went to jail, she sought out Cain in part because she wanted a "more direct contact, not a middleman," suggesting a continuous relationship. And a DEA agent testified that a typical individual purchaser of methamphetamine would buy around a gram. Gilley purchased around 56 grams at the controlled buy. We conclude that Cain has not met the heavy burden of showing that no "rational trier of fact could have found"

a conspiratorial agreement between him and Gilley to distribute drugs. *See Howard*, 947 F.3d at 947.

**B.**

Cain also argues that we "should grant [him] a new trial because the district court failed to instruct the jury that more than a buyer-seller relationship was required to find Cain guilty of conspiracy." Appellant's Br. at 6. We review this argument for plain error because Cain did not object to the district court's jury instructions. *See United States v. Williams*, 998 F.3d 716, 733 (6th Cir. 2021); *see also* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993).

Plain-error review has four components. "First, there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived by the appellant." *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.* (quoting *Puckett*, 556 U.S. at 135). "Third, the error must have affected the appellant's substantial rights," a requirement that typically means the error "affected the outcome of the district court proceedings." *Id.* (quoting *Puckett*, 556 U.S. at 135). Fourth, assuming these criteria are met, "the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Puckett*, 556 U.S. at 135).

Cain's argument fails at the start because he shows no error. We have explained that when "the district court gives complete instructions on the elements of conspiracy, failure to give a buyer-seller instruction is not reversible error." *Williams*, 998 F.3d at 732. Here, the district court gave complete instructions on conspiracy in the form of the Sixth Circuit pattern criminal jury

instructions for conspiracy, and Cain does not challenge the instructions except for the absence of a buyer-seller instruction. As *Williams* makes clear, this is not reversible error.

### III.

In addition to challenging his convictions, Cain challenges his sentence in three respects, arguing that there was not enough evidence to support the firearm enhancement; the district court wrongly used the preponderance-of-the-evidence standard in applying the firearm enhancement; and the sentence is substantively unreasonable.

### A.

Cain argues that the district court erred in enhancing his offense level for "possessing a firearm during the drug offenses," even though "he did not have the gun during the drug sale and the gun was found on the front passenger seat of his car and the drugs were on the floor behind the seat." Appellant's Br. at 7. We review the district court's application of the Sentencing Guidelines de novo and the district court's findings of fact at sentencing for clear error. *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009). A finding of fact is clearly erroneous when the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008).

Under the Sentencing Guidelines, a defendant's base offense level is increased by two levels for a drug trafficking crime "[i]f a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1(b)(1). The Sentencing Commission's commentary on this enhancement explains that it "reflects the increased danger of violence when drug traffickers possess weapons" and "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.11(A). As an example, the commentary says

that "the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." *Id.*

We have endorsed the use of a burden-shifting scheme at sentencing to determine whether the firearm enhancement should apply. "Once the government establishes by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense,' the burden shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). "If [the defendant] fails to meet this burden, the district court should apply the enhancement." *Id.* at 606–07. Several factors may be considered in this analysis, including:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012).

Deputy King, one of the officers who pulled Cain over, testified that when he approached Cain's vehicle, he saw a handgun on the front passenger seat within Cain's reach. The gun's magazine was loaded, but there was no live ammunition in the chamber itself. Sergeant Hurst, the other officer who pulled Cain over, gave the same account and testified that Cain told them the gun belonged to him. After Cain told the officers there was a box with drugs in the vehicle, Hurst found a brown box "in the floorboard behind the passenger, the front passenger seat." PID 1670. Inside the box were "four baggies of a pink substance . . ., two baggies with a crystal substance . . ., two digital scales," several clear baggies, and a spoon. PID 1670–71. The officers also found $1,170 on Cain.

Cain presented numerous arguments at sentencing in support of his position that the government failed to meet its burden of proof. He argued that the gun was on the front passenger seat, while the box with the drugs was in the back of the car; that Gilley testified she did not see Cain with a gun during the controlled buy and had never seen him with a gun; that Cain did not seem afraid of Gilley and hugged her, suggesting he did not feel the need for protection; that DEA Agent McKinley testified that firearms used for drug trafficking are not usually kept in plain view, as was Cain's; and that a police search of Cain's residence turned up no evidence of a significant drug-trafficking operation. Additionally, on appeal, Cain argues that the gun was "loaded" only in the sense that there were bullets in the gun's magazine, but the chamber of the gun did not have a round in it.

The district court rejected Cain's arguments and found that the government had "established by a preponderance of the evidence that [Cain] did, in fact, possess the firearm found on the passenger seat of [his vehicle]." PID 2154. It concluded that Cain did not show "it was clearly improbable that the firearm was not connected to his drug trafficking," *id.* at 2155, noting the gun was loaded and "in close proximity to the drugs"—which the jury found were "possessed by the defendant with intent to distribute"—as well as "in close proximity to the proceeds" of the controlled buy. *Id.*

We find no clear error in the district court's factual determinations or error in its application of the enhancement to the facts. The district court was tasked with determining whether Cain possessed the firearm and whether it was "clearly improbable" the firearm was connected to his drug trafficking. *See Catalan*, 499 F.3d at 606. The traffic stop at which the gun was found occurred at 6:54pm, shortly after the conclusion of the controlled buy. In *Greeno*, this court upheld application of the same firearm enhancement where, "a few days after" a controlled purchase

conducted on the defendant's property, police found firearms "throughout the property in relatively close proximity to drugs and drug paraphernalia." 679 F.3d at 515. Greeno argued "there was no direct evidence showing he possessed a firearm when he sold drugs," but the court concluded he "did not offer any evidence demonstrating that it was clearly improbable that the firearms were connected to his drug offense." *Id.* at 515–16. Here too, given the time span and the proximity of the gun to the money and drug paraphernalia, we find no error in the district court's application of the firearm enhancement. *See Wheaton*, 517 F.3d at 367.

**B.**

Cain additionally argues that the district court's application of the firearm enhancement based merely on a preponderance of the evidence violated his constitutional rights to due process and trial by jury. Cain points out that the jury acquitted him of Count 6, which charged possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). He raised this argument in the district court at sentencing. We review this preserved constitutional challenge de novo. *United States v. Jones*, 641 F.3d 706, 713 (6th Cir. 2011).

Cain acknowledges that the Sixth Circuit permits acquitted conduct to be considered for guideline calculations if proven by a preponderance of the evidence, *United States v. White*, 551 F.3d 381, 384–86 (6th Cir. 2008) (en banc), but he suggests we reconsider *White* in light of the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. 99 (2013). However, the Sixth Circuit has continued to follow *White* after *Alleyne*, *United States v. McReynolds*, 964 F.3d 555, 564 n.1 (6th Cir. 2020), and we are bound to do so "unless it is overruled by either our court sitting en banc or the Supreme Court," *id.* (quoting *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001)). Thus, the district court did not err in

considering acquitted conduct in applying the firearm enhancement, and it permissibly applied the preponderance standard.

We additionally note that the firearm enhancement applies to a broader range of conduct than does § 924(c)(1)(A). The firearm enhancement applies if a firearm "was possessed," USSG § 2D1.1, and is applicable "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense," *id.* cmt. n.11(A). By contrast, § 924(c)(1)(A) applies only if the firearm was possessed "in furtherance of" the drug trafficking. In other words, the Guideline enhancement requires a "connect[ion]" between the weapon and the offense, but the criminal statute requires that the weapon be used "in furtherance of" the offense. The district court noted this distinction and hypothesized that the jury may have acquitted Cain of the § 924(c)(1)(A) charge because it could not find the "in furtherance of" requirement satisfied beyond a reasonable doubt. Given this distinction, the district court did not err in applying the enhancement notwithstanding Cain's acquittal of the firearm charge.

## C.

Lastly, Cain contends his "126-month sentence was substantively unreasonable because no scientific proof supports punishing crimes involving crystal methamphetamine 10 times more harshly than crimes involving powder methamphetamine, the government created the quantity of drugs involved in the crimes, and [he] had no prior record." Appellant's Br. at 7. Cain did not raise these objections in the district court.

When reviewing sentences for reasonableness, we first confirm "that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the

chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). However, if the defendant did not raise an objection at the end of sentencing, we will review a claim of procedural unreasonableness for plain error. *United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2006).

"Assuming that the district court's sentencing decision is procedurally sound," we "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," accounting for "the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51. To find an abuse of discretion, we must be "left with a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Perez-Rodriguez*, 960 F.3d 748, 753 (6th Cir. 2020) (quoting *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505 (6th Cir. 2013)). If the sentence is within the Guidelines range, we apply a presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008).

The district court adopted the presentence report's calculated guideline range of 121 to 151 months in prison. This was based on a base offense level of 30, the two-level firearm enhancement under USSG § 2D1.1(b)(1), and Cain falling into criminal-history category 1. Cain already faced a ten-year mandatory minimum for the amount of methamphetamine involved in his offenses. *See* 18 U.S.C. § 841(b)(1)(A)(viii). And the district court denied him the safety valve because of the firearm enhancement and his insufficiently sharing information with the government. The court went on to weigh the § 3553(a) factors, noting Cain's age of 38 years, lack of criminal history, status as a U.S. army veteran, difficulties in his family life, and work history. The court concluded because of the firearm possession and trafficking of fentanyl—which were not considered in setting the ten-year mandatory minimum—that a sentence of 126 months was appropriate, four months greater than the lowest sentence recommended by the Guidelines.

Cain's first argument that his sentence is substantively unreasonable is based on the harsher treatment for crimes involving pure methamphetamine as compared to methamphetamine mixtures. Crimes involving pure methamphetamine trigger a ten-year mandatory penalty at 50 grams, while crimes involving a methamphetamine mixture trigger a ten-year mandatory penalty at 500 grams. 21 U.S.C. § 841(b)(1)(A)(viii). The Sentencing Guidelines reflect this statutory disparity. *See* U.S.S.G. § 2D1.1(c), Notes to Drug Quantity Table (B)-(C) (defining "Methamphetamine (actual)" as the actual weight of methamphetamine in a mixture and "Ice" as a methamphetamine mixture with at least 80% purity); *id.* § 2D1.1(c) (setting sentencing triggers for methamphetamine (actual) and ice as equivalent to sentencing triggers for ten times greater quantity of methamphetamine mixture). Cain argues this disparity is unfair and resulted in a substantively unreasonable sentence. We have noted that a number of district courts have found the disparity to be a policy reason not to follow the Guidelines in cases involving pure methamphetamine. *See United States v. Johnson*, 812 F. App'x 329, 334 (6th Cir.), *cert. denied*, 141 S. Ct. 430 (2020). Although a district court *may* take that policy disagreement into consideration, it is within the court's discretion not to do so. *See United States v. Brooks*, 628 F.3d 791, 799–800 (6th Cir. 2011); *Johnson*, 812 F. App'x at 334.

Cain's second argument asserts substantive unreasonableness based on the government's role in this case. Cain argues that law enforcement engaged in sentencing entrapment and sentence-factor manipulation. The former is a claim that enforcement entraps a defendant "into selling drugs in amounts beyond what he was predisposed to sell," *United States v. Sed*, 601 F.3d 224, 229 (3d Cir. 2010), and the latter is a claim that law enforcement "unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increase[es] the drug quantities for which the defendant is responsible," *id.* (quoting *United States*

*v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009)). Cain concedes that we have rejected these doctrines, *see United States v. Guest*, 564 F.3d 777, 781 (6th Cir. 2009), but nonetheless argues the court should take them up en banc. Cain may ask the court to do so through a properly filed motion, but this panel is bound by our existing precedent that does not recognize these doctrines. *See Guest*, 564 F.3d at 781.

Cain's reasonableness arguments fail because he does not demonstrate any procedural error and shows no abuse of discretion by the district court. The district court properly followed the guideline calculations, and Cain makes no argument otherwise, except his separate challenge to the firearm enhancement, which we have already addressed.[1]

## IV.

For the reasons stated, we AFFIRM.

---

[1] The government suggests that, although Cain casts his reasonableness arguments as substantive-reasonableness challenges, his arguments are better understood as procedural-reasonableness challenges, which would trigger plain-error review because Cain did not object below. We note that a panel of this court recently reviewed a similar argument about methamphetamine under the substantive-reasonableness rubric, though it is not clear that either party suggested that the question might better be cast as procedural. *See Johnson*, 812 F. App'x at 334 (finding district court had not abused its discretion when declining to account for the difference between methamphetamine and methamphetamine mixtures). We need not decide the question here, however, because Cain's arguments fail under any standard. *See Brooks*, 628 F.3d at 797, 799–800 (declining to decide whether a policy argument to vary from Sentencing Guidelines in a child-pornography case "is a procedural . . . or substantive-reasonableness argument, or perhaps both, because the district court's decision passes muster even under a less deferential standard of review than the plain-error standard").