RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GARY T. REED (21-6161); WENDELL ADRIAN BROWN
(22-5030),

*Defendants-Appellants*.

Nos. 21-6161/22-5030

———————

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:19-cr-00077—Thomas A. Varlan, District Judge.

Decided and Filed:  June 30, 2023

Before:  GILMAN, READLER, and MATHIS, Circuit Judges.

———————

## COUNSEL

**ON BRIEF:**  Thomas W. Jakuc, THOMAS LEGAL CENTERS, St. Clair Shores, Michigan, for Appellant in 21-6161.  David W. Camp, CAMP & CAMP, PLLC, Jackson, Tennessee, for Appellant in 22-5030.  Kevin Quencer, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

GILMAN, J., delivered the opinion of the court in which MATHIS, J., joined. READLER, J. (pp. 23–24), delivered a separate opinion concurring in part and dissenting in part.

———————

## OPINION

———————

RONALD LEE GILMAN, Circuit Judge.  Defendants Wendell Brown and Gary T. Reed were convicted of conspiring to distribute and possess with the intent to distribute at least

50 grams of methamphetamine (meth), in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A).  Both defendants appeal their convictions, arguing that the district court erred by failing to give a "buyer-seller instruction" to the jury.  They also appeal their sentences, arguing that the district court committed a procedural error when calculating their Guidelines ranges under the United States Sentencing Guidelines (the Guidelines).  Brown separately contends that his conviction should be overturned because the district court erroneously admitted an incriminating statement by Reed, his nontestifying codefendant.  For the reasons set forth below, we **AFFIRM** Brown's and Reed's convictions, but **VACATE** their sentences and **REMAND** to the district court for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Drug-trafficking investigation

In October 2018, the Tennessee Bureau of Investigation and the Tennessee Highway Patrol were alerted to a drug-distribution operation in Cumberland County, Tennessee.  After an investigation, law-enforcement agents executed a search warrant that resulted in the seizure of over 200 grams of pure meth from the home of William Eaton.  Further investigation revealed that Roy Headrick supplied meth for the area.  Headrick would make one or two trips to Atlanta each week to obtain, on average, one or two kilograms of meth on each trip.

As the investigation continued, law-enforcement agents executed additional search warrants and intercepted phone calls.  In particular, phone calls and text messages that were consistent with drug trafficking were intercepted between Headrick and Brown.  Other individuals, including Reed, were eventually identified as part of the drug operation.  A federal grand jury ultimately charged Brown and Reed (as well as ten other individuals) in May 2019 with conspiring to distribute, and to possess with the intent to distribute, at least 50 grams of meth.

### B.  Brown and Reed admit to multiple purchases of meth

Law-enforcement agents interviewed Reed just prior to the May 2019 indictment and Brown just after.  According to testimony at trial given by the law-enforcement agents, Brown

and Reed both admitted to purchasing meth on numerous occasions. More specifically, Reed admitted to purchasing one-eighth of an ounce (and sometimes up to one ounce) of meth from Willard Norris twice per week "for a period of time." He also admitted to purchasing one-eighth of an ounce from Eaton approximately twenty times, and one ounce from Michael Howard on a single occasion. According to the law-enforcement agents, Reed knew that Norris had purchased the meth from Headrick, who Reed characterized as a "high-level" meth distributor in the area. Reed had previously witnessed Headrick with over two pounds of meth on one occasion and two ounces on another.

Brown admitted to repeatedly purchasing between one-half and one ounce of meth from Headrick once or twice per week for four or five months. He also admitted that he purchased similar quantities from Charlie White once a week for approximately six weeks. When purchasing from Headrick, Brown would sometimes purchase meth on "credit," paying Headrick back with the proceeds he earned from selling the meth. Brown also admitted to occasionally purchasing meth from Headrick on behalf of a woman referred to as Garrett.

## C. Brown and Reed proceed to trial

The government presented testimony at trial from several law-enforcement agents, three coconspirators (Headrick, Eaton, and Norris), and Headrick's Atlanta-based supplier, Rogelio Barajas. Headrick testified that he supplied Brown with up to two ounces of meth per week, sometimes allowing Brown to pay him back after Brown had sold the meth. In addition, the government introduced text messages and phone calls between Brown and Headrick regarding meth transactions. These included communications where Brown asked Headrick to "front" him meth (*i.e.*, allow him to purchase it on credit), offers from Brown to trade commodities for meth, and various other requests for meth.

The government also presented testimony from law-enforcement agents that relayed the admissions that both Brown and Reed made during their interviews, as described above. During the questioning of State Trooper Jeremy Newcome, Newcome testified that Reed admitted to knowing that Headrick was a high-level meth distributor. On cross-examination, Reed's counsel questioned whether Newcome meant that Reed *personally* knew Headrick to be a high-level

distributor or whether Reed simply knew of Headrick's *reputation* as such a distributor. Newcome replied that Reed said he "met with [Headrick] and witnessed him in possession of . . . two ounces of meth" and that he also "purchased off of [Headrick]."

Reed's counsel then asked Newcome whether that meeting occurred at Norris's residence. Before Newcome could answer, however, the prosecutor interjected and called for a sidebar "out of an abundance of caution." The prosecutor feared that Newcome might, when testifying about where Reed had met with Headrick, reveal that on one occasion Reed met Headrick at Brown's house, thus potentially incriminating Brown in violation of *Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that the Sixth Amendment's Confrontation Clause is violated when the court admits an incriminating out-of-court statement by a nontestifying codefendant). In his interview with Newcome, Reed had admitted that he had met Headrick at both Norris's and Brown's respective houses. The parties agreed, and the judge confirmed, that Brown should not be mentioned to avoid the possibility of incriminating him.

Newcome's cross-examination then resumed. Reed's counsel questioned Newcome on whether Reed bought meth directly from Headrick. In response, Newcome read directly from his report, inadvertently mentioning Brown's name before stopping midsentence: "'Reed stated he witnessed Headrick at Brown' – I'm sorry." The judge then interjected, saying "hold on a second," and clarified whether Reed's counsel wanted Newcome to read the report or just use it to refresh his recollection. Reed's counsel continued to request that Newcome read the statement, but this time Newcome did not mention Brown, stating: "Reed stated he witnessed Headrick in Crossville, Tennessee in possession of two ounces [of meth]. Reed confirmed he purchased 1/8 ounce of [meth] at this location the night before his most recent arrest." Brown's counsel made no objection, and the questioning continued.

As the government neared completion of its case-in-chief, a joint stipulation was entered into evidence regarding the quantity and purity of the meth seized from various codefendants. The stipulation noted that 2,665 grams (or 2.665 kilograms) of the meth seized from various codefendants was "pure" meth. This included 479 grams of pure meth seized from Headrick, 1,897 grams of pure meth seized from Barajas, 233 grams of pure meth seized from Eaton, and 56 grams of pure meth seized from Norris. No meth was seized from either Brown or Reed.

**D. The defendants request a "buyer-seller" jury instruction**

Brown and Reed asked the district court to instruct the jury that "a conspiracy requires more than just a buyer-seller relationship."  More specifically, their requested jury instruction stated:

(1) A conspiracy requires more than just a buyer-seller relationship between the defendant and another person.  Additionally, a buyer and seller of methamphetamine do not enter into a conspiracy to distribute such methamphetamine simply because the buyer resells/exchanges such controlled substance to/with another person[,] even if the seller knows that the buyer intends to sell/exchange such drug.

(2) To establish that a buyer or seller knowingly became a member of a conspiracy with another person to distribute methamphetamine, the government must prove that the buyer and seller had the joint criminal objective of distributing such controlled substance to others.

(3) Simply showing that a buyer purchased a quantity larger than could be used for personal consumption, however, is not enough to show conspiracy.

(4) To determine whether a conspiracy exists between the defendant Wendell Brown and Roy Headrick or any other person[,] you must consider the length of any relationship between the parties; whether there was an established method of payment; the extent to which there was an established method of payment; the extent to which the transactions were standardized; and the level of mutual trust between the parties.

(5) Mere repeated purchasing on its own does not establish a conspiracy.

(6) If you find that the defendant Brown is simply a purchaser[] of methamphetamine, then you must find that the Government has failed to prove the defendant Brown was part of a drug conspiracy beyond a reasonable doubt and you must find him not guilty.

The government opposed the buyer-seller instruction, arguing that the Sixth Circuit's pattern jury instructions for conspiracy were sufficient and more appropriate.  During the charge conference just prior to jury deliberations, the district court denied Brown's and Reed's request for a buyer-seller instruction, noting that it was either "inappropriate" or "not necessary."  The court stated that the defendants' "argument as to [a] buyer-seller relationship can be made within the context of the Sixth Circuit pattern conspiracy charge as well as can be presented perhaps in the defense theory charge if that's what the defendants want."

The court ultimately used, nearly verbatim, the Sixth Circuit Pattern Jury Instruction 14.05 on conspiracy. The relevant portion of this instruction reads as follows.

Count One charges the defendants with conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine. It is a crime for two or more persons to conspire or agree to commit a drug crime even if they never actually achieved their goal.

A conspiracy is a kind of criminal partnership. For you to find any one of the defendants guilty of the conspiracy charge, the government must prove each and every one of the following elements beyond a reasonable doubt: First, that two or more persons conspired or agreed to distribute and to possess with intent to distribute 50 grams or more of methamphetamine; and, second, that the defendants knowingly and voluntarily joined the conspiracy. . . .

With regard to the first element, a criminal agreement, the government must prove that two or more persons conspired or agreed to cooperate with each other to distribute and to possess with intent to distribute 50 grams or more of methamphetamine. This does not require proof of any formal agreement, written or spoken, nor does this require proof that everyone involved agreed to know all the details. But proof that people simply met together from time to time and talked about common interests or engaged in similar conduct is not enough to establish a criminal agreement. These are things you may consider in deciding whether the government has proved an agreement, but without more, they are not enough.

What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to distribute 50 grams or more of methamphetamine. This is essential.

An agreement can be proved indirectly by facts and circumstances which lead to a conclusion that an agreement existed. But it is up to the government to convince you that such facts and circumstances existed in this particular case. . . .

With regard to the second element, the defendants' connection to the conspiracy, the government must prove the defendants knowingly and voluntarily joined that agreement. The government must prove the defendants knew the conspiracy's main purpose and voluntarily joined the conspiracy intending to help advance or achieve its goals. You must consider each defendant separately in this regard.

This does not require proof that the defendant knew everything about the conspiracy or everyone else involved or that each defendant was a member of it from the very beginning. Nor does it require proof that the defendant played a

major role in the conspiracy or that [his] connection to it was substantial. A slight role or connection may be enough. . . .

[P]roof that a defendant simply knew about a conspiracy or was present at times or associated with members of the group is not enough, even if he approved of what was happening or did not object to it.

Similarly, just because a defendant may have done something that happened to help a conspiracy does not necessarily make him a conspirator. These are all things you may consider in deciding whether the government has proved that the defendant joined the conspiracy. But without more, they are not enough.

A defendant's knowledge can be proved indirectly by facts and circumstances which lead to a conclusion that he knew the conspiracy's main purpose. But it is up to the government to convince you that such facts and circumstances existed in this particular case.

You must be convinced the government has proved all of these elements beyond a reasonable doubt in order to find any one of these defendants guilty of the conspiracy charge.

A related instruction that the district court provided was the defendants' requested theory-of-the-defense instruction: "Defendants say they did not knowingly and voluntarily agree to participate in a drug conspiracy, and, instead, are users of the drugs to feed their addiction, and quantity alone should not be considered for conspiracy." The jury ultimately convicted Brown and Reed as charged.

**E.  The district court sentences Brown and Reed to 360 months in prison**

A probation officer prepared Presentence Reports for both defendants, determining that each was responsible for 4.5 kilograms of actual meth, resulting in an offense level of 38. Brown had a criminal-history category of V and Reed had a criminal-history category of VI. The corresponding Guidelines ranges for both Brown and Reed were the same, being 360 months to life in prison.

Brown and Reed both objected to the purity of the meth that was used to calculate their Guidelines ranges, arguing that the Presentence Reports' determination that the meth was "actual meth" (also known as pure meth), as opposed to a "mixture containing a detectible amount of

meth," was in error.  After considering the parties' arguments, the district court overruled the defendants' objections and sentenced both of them based on the Guidelines range for actual meth.  Both Brown and Reed were sentenced to 360 months in prison.  These appeals followed.

## II. ANALYSIS

### A. The defendants' request for a buyer-seller jury instruction was appropriately denied by the district court

Brown and Reed argue that the district court's denial of their request to provide a buyer-seller jury instruction is reversible error.  The legal accuracy of a jury instruction is a question of law that we review de novo.  *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006).  But the failure to provide a requested instruction is reviewed under the abuse-of-discretion standard.  *Id.*  District courts have "broad discretion in drafting jury instructions" and, when viewing the instructions as a whole, "[w]e will not reverse the trial court unless the jury charge fails to accurately reflect the law."  *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000) (internal citation and quotation marks omitted).  A district court abuses its discretion in declining to give a jury instruction "only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case."  *United States v. LaVictor*, 848 F.3d 428, 454 (6th Cir. 2017).  The defendants have not established any, let alone all, of these factors.

#### 1.  The defendants' buyer-seller instruction is not entirely consistent with Sixth Circuit law

The parties dispute whether the proposed buyer-seller instruction is appropriate under Sixth Circuit law.  Brown and Reed are certainly correct that there is a buyer-seller exception to what constitutes a conspiracy in this circuit.  We have "long held that a buyer-seller agreement alone does not establish a 'conspiracy,'" *United States v. Wheat*, 988 F.3d 299, 304 (6th Cir. 2021), and that "mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy."  *United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996); *see also United States v. Cole*, 59 F. App'x 696, 699 (6th Cir. 2003) ("Generally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy.").

And because mere sales are not enough, this court has "identified additional 'factors' that allow a jury to find an agreement between a buyer and seller to go beyond their own sale." *Wheat*, 988 F.3d at 308 (citing *United States v. Deitz*, 577 F.3d 672, 680-81 (6th Cir. 2009)); *see also Cole*, 59 F. App'x at 700 (noting with approval several factors that the Seventh Circuit has used to determine whether a drug conspiracy exists) (citing *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001)).  Much of the defendants' proposed buyer-seller jury instruction mentions these "factors," such as whether there were repeat purchases of drugs, the quantity of the drugs, the method of payment, the length of the relationship, etc.  *See Wheat*, 988 F.3d at 308-09 (collecting cases and analyzing the factors that allow a jury to find the existence of a drug conspiracy beyond just a buyer-seller relationship); *see also Deitz*, 577 F.3d at 680-81 (noting the relevant factors).

The defendants' proposed instruction, however, contains elements that are not entirely consistent with the law in this circuit.  In fact, two of the very cases that defendants cite in support of their buyer-seller instruction, *United States v. Brown*, 332 F.3d 363, 372-73 (6th Cir. 2003), and *Cole*, 59 F. App'x at 699, contradict language in their proposed instruction.  For example, the proposed buyer-seller instruction states that "[m]ere repeated purchasing on its own does not establish a conspiracy."  But *Cole*, in analyzing this court's precedent, makes clear that evidence of repeat purchases has been sufficient for a conspiracy conviction.  59 F. App'x at 700 (citing *Anderson*, 89 F.3d at 1311); *accord United States v. Potter*, 927 F.3d 446, 454 (6th Cir. 2019) ("[A] buyer/seller relationship alone is not enough to establish participation in the conspiracy.  As noted, however, [the defendant's] repeat transactions could lead a jury to find more than that insufficient relationship." (internal citation and quotation marks omitted)); *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009) ("While a buyer-seller relationship does not establish a conspiracy, evidence of repeat purchases can.").

The proposed buyer-seller instruction also states that "[s]imply showing that a buyer purchased a quantity larger than could be used for personal consumption . . . is not enough to show conspiracy."  But *Brown* states that "a large volume of narcotics creates an inference of conspiracy."  332 F.3d at 373 (quoting *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir.

1986)); *see also Cole*, 59 F. App'x at 700 ("[T]his court found that . . . purchases of a large volume . . . were sufficient for a conspiracy conviction (citing *Anderson*, 89 F.3d at 1311)).

In sum, the district court would not have erred in giving a properly crafted buyer-seller instruction to the jury. *See Wheat*, 988 F.3d at 312 ("[W]e cannot ignore this buyer-seller rule when we ask whether there was enough evidence for all essential elements of the crime."). But because the proposed instruction contained incorrect statements of Sixth Circuit law, the district court did not abuse its discretion in denying the defendants' request.

### 2. *The buyer-seller instruction was substantially covered by the pattern conspiracy jury instructions*

This court, moreover, has made clear that "when . . . the district court gives complete instructions on the elements of conspiracy, failure to give a buyer-seller instruction is not reversible error." *United States v. Williams*, 998 F.3d 716, 732 (6th Cir. 2021) (citing, *inter alia*, *United States v. Dado*, 759 F.3d 550, 568 (6th Cir. 2014) (declining to provide a buyer-seller instruction because it "was substantially covered by the standard jury instructions regarding conspiracy and accomplice liability, which were delivered to the jury at Defendant's trial")); *see also Wheat*, 988 F.3d at 311-12 ("We generally will not reverse a district court for failing to give an instruction on the buyer-seller limitation"); *Riggs v. United States*, 209 F.3d 828, 833 (6th Cir. 2000) ("[A] buyer-seller instruction is unnecessary if the district judge has given a complete instruction reciting all the elements of conspiracy and requirements for membership in a conspiracy."), *abrogated on other grounds as recognized in Kumar v. United States*, 163 F. App'x 361, 366 (6th Cir. 2006).

That is precisely what happened here. The district court provided, nearly verbatim, the Sixth Circuit's pattern jury instructions regarding conspiracy. Further, the district court explicitly gave the defendants the chance to craft a theory-of-the-defense charge that would encompass their buyer-seller theory. And the district court ultimately provided such an instruction, telling the jury that that the "Defendants say they did not knowingly and voluntarily agree to participate in a drug conspiracy, and, instead, are users of the drugs to feed their addiction, and quantity alone should not be considered for conspiracy." We therefore conclude

that the rejected buyer-seller instruction was substantially covered by the jury instructions provided.

### 3. *The rejection of the buyer-seller instruction did not impair Brown's and Reed's defense theory*

As noted above, the district court provided the defendants' requested theory-of-the-defense instruction, which included several elements of the buyer-seller instruction that they had proposed. The defendants thus ultimately received part of their requested instruction. This fact, when combined with the defects in the proposed buyer-seller instruction and the overlap with the conspiracy instruction as given, leads us to the conclusion that the lack of the requested instruction did not impair Brown's or Reed's defenses. The district court therefore did not abuse its discretion in denying the same.

As a final point on this issue, we note Reed's additional argument that the buyer-seller instruction was necessary because his defense became "illusory and irretrievably mired when shaded by the Government's case against codefendant [] Brown." Reed's argument, however, does not cure the defects in the proposed buyer-seller instruction identified above and therefore is not a valid basis for finding that the district court abused its discretion by not providing the instruction.

## B. Brown's rights under the Sixth Amendment's Confrontation Clause were not violated

Brown makes an additional argument that State Trooper Newcome's inadvertent mention at trial of Brown's name when reading a statement made by Reed (his nontestifying codefendant) violated Brown's Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968). The Confrontation Clause protects defendants from the introduction at trial of incriminating out-of-court statements made by nontestifying codefendants. *Id.* at 136-37; *see also United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014) ("In *Bruton*, the Supreme Court held that the Confrontation Clause is violated by the introduction of an incriminating out-of-court statement by a non-testifying co-defendant.").

At issue in this case is Newcome's response to a question about how Reed knew Headrick. Newcome, reading directly from his police report before stopping midsentence,

testified that "'Reed stated he witnessed Headrick at Brown' – I'm sorry." The judge then stopped Newcome, saying "hold on a second," and clarified whether Reed's counsel wanted Newcome to read the report out loud or to just use it to refresh his recollection. Reed ultimately continued reading from the report, but this time he eliminated all references to Brown. Brown's counsel never objected.

This court generally reviews Confrontation Clause challenges de novo. *Ford*, 761 F.3d at 652 (citation omitted). However, if a defendant fails to object on Confrontation Clause grounds, we review under the plain-error standard. *Id.* "Plain error requires (1) an 'error or defect,' (2) that is 'clear or obvious,' and (3) that 'affect[s] the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the district court proceedings."'" *Id.* at 655-56 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). And even if each of the first three prongs is satisfied, we will correct the plain error only if (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett*, 556 U.S. at 135 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

Even if Brown could establish a clear or obvious error, he plainly fails under prong (3) because Newcome's inadvertent mention of Brown's name did not affect the outcome of the trial. There was ample evidence presented at trial that Brown conspired to distribute meth with Headrick. This included Brown's own confession about buying meth from Headrick multiple times per week, recorded text messages and phone calls between Brown and Headrick, and testimony from Headrick himself. In essence, the evidence presented was "so overwhelming" that the admission of "'Reed stated he witnessed Headrick at Brown' – I'm sorry" did not "contribute[] to [Brown's] conviction." *See United States v. Macias*, 387 F.3d 509, 520 (6th Cir. 2004) (quoting *Schneble v. Florida*, 405 U.S. 427, 432 (1972)).

We can therefore say with "fair assurance that the jury's verdict was not substantially swayed by" the admitted statement. *See United States v. Warman*, 578 F.3d 320, 341 (6th Cir. 2009); *see also United States v. Stokes*, 834 F. App'x 213, 217 (6th Cir. 2020) (finding no plain error, and that a "curative instruction would have only highlighted" the objectionable

statement where the statement "was fleeting and likely did not have much influence on the jury's verdict, given the other evidence of guilt at trial"). In sum, the Confrontation Clause was not violated.

## C. The district court procedurally erred when calculating the defendants' Guidelines ranges

We now turn to Brown's and Reed's argument regarding their sentences. The defendants challenge the district court's determination that they were involved in the distribution of 4.5 kilograms of actual meth, as opposed to 4.5 kilograms of a "mixture containing a detectable amount of meth." We review sentences for both procedural and substantive reasonableness under the abuse-of-discretion standard. *United States v. Battaglia*, 624 F.3d 348, 350 (6th Cir. 2010). Here, the defendants focus only on the procedural reasonableness of their sentences, arguing that the district court improperly calculated their Guidelines ranges. *See United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) ("If the district court misinterprets the Guidelines or miscalculates the Guidelines range, then the resulting sentence is procedurally unreasonable."). "The court's legal interpretation of the Guidelines are reviewed de novo, but its factual findings are reviewed under the clearly-erroneous standard." *Battaglia*, 624 F.3d at 351 (citing *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007)).

The Guidelines treat "methamphetamine," "methamphetamine (actual)," and "ice" (not at issue here) differently. *See* USSG § 2D1.1(c). Under the Guidelines, "methamphetamine" refers to "the entire weight of any mixture or substance containing a detectable amount" of methamphetamine (i.e., a "meth mixture"). *Id.*, Notes to Drug Quantity Table (A). "Methamphetamine (actual)" (i.e., "actual meth") means the "weight of the controlled substance, itself, contained in the mixture or substance." *Id.*, Notes to Drug Quantity Table (B) ("For example, a mixture weighing 10 grams containing [methamphetamine] at 50% purity contains 5 grams of [methamphetamine] (actual)"). And "ice," which is treated the same as actual meth, means "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." *Id.*, Notes to Drug Quantity Table (C).

The Drug Quantity Table within the Guidelines employs a 10:1 weight ratio between meth mixtures and actual meth. *See id* at § 2D1.1(c). This results in 4.5 kilograms of actual

meth having an offense level of 38, whereas 4.5 kilograms of a meth mixture has an offense level of 32. *Id.*; *see also United States v. Kennedy*, 65 F.4th 314, 326 (6th Cir. 2023) (outlining the treatment of meth under the Guidelines); *United States v. Johnson*, 812 F. App'x 329, 331-32 (6th Cir. 2020) (same). So, if the district court had calculated the defendants' sentences based on 4.5 kilograms of a meth mixture, both Brown's and Reed's offense levels would have decreased from 38 to 32, and their corresponding Guidelines ranges would have been 188 to 235 months of imprisonment for Brown and 210 to 262 months of imprisonment for Reed. *See* USSG Ch. 5, Pt. A.

The defendants raise two arguments in support of their claim that their Guidelines ranges were improperly calculated. First, they argue that the district court erred in calculating their Guidelines ranges based on actual meth because this resulted in an unconstitutional "upward departure of a criminal sentence" based on facts not found by a jury. Second, they argue that the court's determination that they were responsible for distributing 4.5 kilograms of actual meth was clearly erroneous. We address each argument in turn.

### 1. *The district court did not unconstitutionally enhance Brown's and Reed's sentences*

The defendants turn to the language of the jury-verdict form to argue that the jury rejected the possibility that the meth at issue was actual meth. That verdict form asked the jury, in relevant part, whether the defendants "distribute[d] and possess[ed] with intent to distribute methamphetamine" and, if so, how much "methamphetamine . . . was attributable" to each defendant. The jury answered "guilty" to the first question, and "50 grams or more" for the second. Because the indictment and the verdict form specified "methamphetamine" and not "actual methamphetamine," the defendants contend that the jury specifically found that the meth distributed was *not* actual meth. By nonetheless sentencing the defendants for distributing actual meth, the defendants argue, the district court made an unconstitutional "upward departure on a criminal sentence" in violation of *Blakely v. Washington*, 542 U.S. 296, 301 (2004) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" as determined by the statute of conviction "must be submitted to

a jury, and proved beyond a reasonable doubt." (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000))).

We find no merit in the defendants' argument. Contrary to their contention, the district court's determination at sentencing that the meth was actual meth did not contradict the jury-verdict form. The criminal statute under which Brown and Reed were convicted outlines a single offense that can be committed two ways: by distributing either "50 grams or more of methamphetamine . . . or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine." 21 U.S.C. § 841(b)(1)(A)(viii). Brown and Reed were charged with a conspiracy to distribute 50 grams or more of methamphetamine and the verdict form exactly mirrored the language of the statute by stating "methamphetamine," and not "a mixture or substance containing a detectable amount of methamphetamine." We do note the confusing dual treatment of the term "methamphetamine" between the statute (which uses "methamphetamine" to refer to actual meth) and the Guidelines (which uses "methamphetamine" to refer to a meth mixture). Regardless of this idiosyncrasy, we know that a conviction under § 841(b)(1)(A) for distributing only 50 grams of meth *cannot* mean 50 grams of a meth mixture. *See Kennedy*, 65 F.4th at 326 ("Crimes involving pure [i.e., actual] methamphetamine trigger a ten-year mandatory penalty at 50 grams, while crimes involving a methamphetamine mixture trigger a ten-year mandatory penalty at 500 grams.") (citing 21 U.S.C. § 841(b)(1)(A)(viii)).

The defendants' claim that the jury "determined the purity" of the meth and "did not agree" that it was actual meth is therefore not accurate. In fact, the opposite is true because, as noted above, a conviction for a meth mixture under § 841(b)(1)(A) is possible only if the defendants were found to have distributed at least 500 grams of the substance. The more appropriate conclusion is that the jury convicted the defendants of a conspiracy to distribute at least 50 grams of *actual* meth.

The district court did engage in additional factfinding, however, because the defendants were ultimately sentenced for conspiring to distribute 4.5 kilograms of actual meth—well above the jury's verdict of "50 grams or more" of actual meth. This raises the question of whether such judicial factfinding resulted in an unconstitutional sentencing increase in violation of *Blakely*, which makes clear that any fact, other than the fact of a prior conviction, that increases a

sentence beyond the statutory maximum penalty for the statute of conviction must be submitted to a jury and proven beyond a reasonable doubt.  542 U.S. at 301.

We conclude that the district court did not impose an unconstitutional sentence.  This court, sitting en banc a few years after *Blakely* was decided, held that "[s]o long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range."  *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc); *accord Apprendi*, 530 U.S. at 481 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." (emphasis in original)).  More specifically, "a sentencing judge may find (by a preponderance of the evidence) that a defendant is responsible for a greater quantity of drugs than determined by the jury."  *United States v. Castro*, 960 F.3d 857, 868 (6th Cir. 2020) (citing *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam)).

Here, a conviction for distributing 50 or more grams of actual meth has a statutory minimum ten-year prison sentence and a statutory maximum of life in prison.  21 U.S.C. § 841(b)(1)(A).  The defendants' sentences of 360 months in prison did not exceed the statutory maximum; thus, the district court's factfinding at sentencing did not result in an upward departure in violation of *Blakely*.

Brown and Reed further argue that the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), applied *Blakely* to the Guidelines such that any fact that alters the Guidelines range must also be found by the jury.  True enough, *Booker* concluded that *Blakely* applies to the Guidelines.  *Id.* at 243.  But the ultimate solution in *Booker* was to render the Guidelines advisory rather than mandatory.  *Id.* at 245; *see also United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005) ("Based on the Supreme Court's ruling in *Booker,* the Sentencing Guidelines are no longer mandatory; they are advisory.").

"In the post-*Booker* world, the relevant statutory ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code."  *White*, 551 F.3d, at 384; *see*

*also id.* at 385 ("So long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts . . . when selecting a sentence within that statutory range."); *Stone*, 432 F.3d at 654-55 ("*Booker* did not eliminate judicial fact-finding.  Instead, the remedial majority gave district courts the option, after calculating the Guideline range, to sentence a defendant outside the resulting Guideline range.").  Because the district court's factfinding altered only the defendants' Guidelines ranges and not the statutory minimum and maximum penalties identified by the U.S. Code, the defendants' *Booker*-based argument is without merit.

### 2. *The district court provided no basis to conclude that at least 4.5 kilograms of the meth distributed was actual meth*

Although a sentence based on the distribution of 4.5 kilograms of actual meth would not be unconstitutional under *Blakely*, the government nonetheless bears the burden of proving the quantity of actual meth at sentencing by a preponderance of the evidence.  *See United States v. McReynolds*, 964 F.3d 555, 563 (6th Cir. 2020); *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008).  We review the district court's factual findings at sentencing under the clear-error standard.  *McReynolds*, 964 F.3d at 563.  A factual finding is clearly erroneous only where, after considering all the evidence, the court is "left with the definite and firm conviction that a mistake has been committed."  *United States v. Sands*, 4 F.4th 417, 420 (6th Cir. 2021) (quoting *Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985)).  "Importantly, '[t]he question is not whether the finding is the best or only conclusion that can be drawn from the evidence, or whether it is the one [we] would draw.'  Instead, 'the test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one.'"  *Id.* (alterations in original) (quoting *Heights Cmty. Cong.*, 774 F.2d at 140).

Brown and Reed stipulated at trial that 2.665 kilograms of the meth seized during the investigation was tested and determined to be "pure" (i.e., actual meth).  The defendants do not challenge on appeal that, although no meth was ever found on either of them personally, this 2.665 kilograms of actual meth was within the scope of their relevant conduct and could be attributed to them at sentencing.  *See McReynolds*, 964 F.3d at 563 (noting that defendants can

be sentenced based on all drug quantities within the scope of their relevant conduct). This leaves the question of whether Brown and Reed should be held responsible for 4.5 kilograms of actual meth—1.835 kilograms more than was ever tested and determined to be actual meth.

"Where exact drug quantity cannot be established, a district court may make a reasonable quantity estimate if that estimate is supported by the preponderance of the evidence." *United States v. Treadway*, 328 F.3d 878, 885 (6th Cir. 2003). A court must "err on the side of caution," however, and hold defendants responsible only "for a specific quantity for which he is more likely than not actually responsible." *United States v. Rios*, 830 F.3d 403, 436 (6th Cir. 2016) (quoting *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013)).

The district court overruled Reed's objection to the purity of the meth, citing the stipulation that 2.665 kilograms of the seized meth was actual meth. It also noted that "the co-conspirators' actions as relate to the conspiracy involving actual methamphetamine were within . . . the scope of the conspiracy." Without any further elaboration on the question of the meth's purity, the court concluded that Reed "was responsible . . . for at least 4.5 kilograms of actual methamphetamine."

The district court reached the same conclusion at Brown's sentencing, but never addressed the question of the meth's purity when calculating Brown's Guidelines range. It instead focused on whether there were 4.5 kilograms of meth within the scope of the conspiracy, not whether those 4.5 kilograms were comprised of actual meth. The court did later touch on the question of the drug's purity when analyzing whether a downward variance in Brown's sentence was appropriate because of the disparate treatment of actual meth and meth mixtures under the Guidelines. Although the court analyzed Brown's objection only as a policy objection to the Guidelines, it nonetheless concluded that the meth at issue could appropriately be considered actual meth because of the stipulation at trial as to the purity of 2.665 kilograms of meth.

In order to sentence a defendant for conspiracy-wide drug quantities, the district court must make "particularized findings as to why it is doing so." *McReynolds*, 964 F.3d at 564. This includes determining whether "the acts were within the scope of the defendant's agreement" and whether the acts "were foreseeable to the defendant." *Id.* at 563 (quoting *United States*

*v. Campbell*, 279 F.3d 392, 399-400 (6th Cir. 2002)).  The district court diligently and properly engaged in this analysis to determine that the defendants could be held responsible for at least 4.5 kilograms of *some type of meth*, but, as noted above, provided practically no analysis on the question of whether 4.5 kilograms of *actual* meth were properly attributable to them.  *See Gall v. United States*, 552 U.S. 38, 50 (2007) (noting that the district court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing"); *Treadway*, 328 F.3d at 886 (noting that "a district court cannot adopt 'the factual findings of the presentence report without making factual determinations of its own' when the facts are in dispute" (quoting *United States v. Parrott*, 148 F.3d 629, 633 (6th Cir. 1998))).  The district court ultimately relied solely on the joint stipulation.  But this gets us to only 2.665 kilograms of actual meth, well below 4.5 kilograms of actual meth.

Perhaps attempting to bolster the district court's analysis of the question, the government contends, without citation, that the court's determination was "amply supported by evidence at trial, which included each defendant['s] confession, the testimony of co-conspirators, and their stipulation that more than 2 kilograms of methamphetamine recovered from their suppliers was 'pure' methamphetamine."  But after thoroughly reviewing the record, we cannot agree.

The only evidence that we can locate as to the purity of any meth is the parties' joint stipulation.  No other meth was tested, and the government did not introduce any additional testimony or evidence that would support a determination that an additional 1.835 kilograms of meth was actual meth.  True enough, the defendants both confessed to purchasing meth, but they admitted nothing as to the meth's purity.  The government's own briefing acknowledges as much, contending only that the defendants admitted to purchasing "methamphetamine."

And the trial testimony from Brown's and Reed's coconspirators gets us no closer.  Four coconspirators testified:  Barajas, Eaton, Headrick, and Norris.  We can find no mention in their testimony that the meth that they handled was actual meth, and the government has pointed us to no specific testimony of the coconspirators that establishes otherwise.

In fact, Norris's testimony directly contradicts the government's theory.  When asked by the government whether the meth he received from Headrick was high or low quality, Norris

replied "[e]verybody's [meth] is different, so some of it's good and some of it's bad."  This highlights the flaw in assuming, without further evidence, that there was an additional 1.835 kilograms of actual meth beyond what was tested because the meth handled by the coconspirators was of unknown and varying purity.

The closest the government came to demonstrating that there was more than 2.665 kilograms of actual meth being distributed was through the testimony of Nathan Stinnett, an investigator for the Oak Ridge Police Department.  He testified that the "new norm" for meth is "crystal meth," which he claims is a lot purer than "the old shake-and-bake."  But on its own, this is clearly insufficient to support an inference that the meth at issue *in this case* was actual meth.  He simply commented on the "new norm" for meth in general.

Plus, even if the meth at issue was "purer" than the meth of days past, we have no clue if that means 100% purity, 70% purity, or just 5% purity.  *See United States v. Carnell*, 972 F.3d 932, 942 (7th Cir. 2020) (finding that meth being referred to as "crystalline" fails to meet the burden at sentencing without "evidence from a chemist or other relevant expert that methamphetamine cannot form a crystalline structure below 80% purity").  This matters because actual meth is determined under the Guidelines by multiplying the percent purity by the total grams of the meth mixture.  *See* USSG § 2D1.1(c), Notes to Drug Quantity Table (B) ("For example, a mixture weighing 10 grams containing [methamphetamine] at 50% purity contains 5 grams of [methamphetamine (actual)]").  Stinnett's testimony therefore provides no support for the question of whether an additional 1.835 kilograms of meth in the conspiracy was actual meth.

The dissent attempts to get around the lack of evidence of actual meth with its own "back-of-the-envelope math."  Dissent at 24.  But in doing so, the dissent makes its own "particularized findings" to surmise that Headrick purchased between 84 and 108 kilograms of meth from Barajas during the 7 to 9 months that both defendants were engaged in the conspiracy, that the entirety of this amount was both within the scope of the defendants' agreement and foreseeable to each defendant, and that the quantity was at least 2.185% pure meth.  *Id.*; *see also United States v. McReynolds*, 964 F.3d 555, 564 (6th Cir. 2020).

The district court, however, never made a finding as to the total quantity of meth that Headrick handled, noting only that he received "*up to* 3 kilograms per week for several weeks." (emphasis added). Nor did it determine whether this full amount was both within the scope of the defendants' agreement and foreseeable to each defendant. *See McReynolds*, 964 F.3d at 563-64. The district court should be the entity to engage in the particularized factfinding as to the quantity and purity of the meth for which each defendant should be held responsible, not this court from our "distant perch." *See* Dissent at 24; *see also McReynolds*, 964 F.3d at 563-64.

There is simply no evidence in the record about the purity of any meth beyond the 2.665 kilograms in the stipulation. The dissent nonetheless attempts to extrapolate the amount of pure meth based solely on its own estimate of the total volume of meth handled by Headrick. But such an extrapolation is inappropriate without "[s]ufficient indicia of reliability." *See United States v. Jackson*, 470 F.3d 299, 310-11 (6th Cir. 2006) (noting that statistically-based drug-quantity calculations are permitted only where the government can demonstrate "an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with the accepted standards of reasonable reliability" (quoting *United States v. Scalia*, 993 F.2d 984, 989 (1st Cir. 1993)). Absent any evidence in the record of the meth's purity or any indicia of reliability for statistical extrapolation, the dissent ultimately relies on a guess, even if an educated one, that the purported 84 to 108 kilograms of meth was more than 2.185% pure. Although this is certainly plausible, an educated guess is surely not a substitute for the "preponderance of the evidence" required for factfinding at sentencing. *See McReynolds*, 964 F.3d at 563. We are therefore unpersuaded by the dissent, and are concerned about the unwarranted precedent that it would set if district courts estimated the quantity of actual meth based solely on the quantity of unseized, untested meth.

At bottom, we find that the district court clearly erred in determining that a preponderance of the evidence in the record supports the factual determination that Brown and Reed conspired to distribute at least 4.5 kilograms of actual meth. This is particularly true given the need to "err on the side of caution" when the "precise quantity of drugs involved is uncertain." *Rios*, 830 F.3d at 436 (quoting *Johnson*, 732 F.3d at 581). The Guidelines ranges

were therefore improperly calculated for both defendants, which is a procedural error.  *See United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012).

We briefly note that, on remand, the offense level under the Guidelines might remain at 38 for one or both defendants if the district finds that 45 kilograms of a meth mixture was within the scope of Brown's and/or Reed's relevant conduct.  *See* USSG § 2D1.1(c), Notes to Drug Quantity Table (B).  But the court must engage in particularized factfinding to make such a determination when calculating the Guidelines ranges.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Brown's and Reed's convictions, but **VACATE** their sentences and **REMAND** to the district court for further proceedings consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

CHAD A. READLER, Circuit Judge, concurring in part and dissenting in part. Like the majority opinion, I would affirm defendants' convictions. But I would also affirm their sentences, as the district court properly attributed 4.5 kilograms of pure methamphetamine to Brown and Reed alike.

Guiding my conclusion is our deferential standard of review of factual findings at sentencing. The prosecution must prove the drug quantity attributable to a defendant by a preponderance of the evidence. *United States v. McReynolds*, 964 F.3d 555, 563 (6th Cir. 2020) (quoting *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010)). A reasonable estimate, based on physical or testimonial evidence, is acceptable. *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020) (citation omitted). And in the context of a distribution conspiracy like the one these defendants took part in, the quantity may sweep in more drugs than what the defendants personally handled. *Accord* Maj. Op. at 18 (citing *McReynolds*, 964 F.3d at 563–64; *see also* U.S.S.G. § 1B1.3 & cmt.3(B). When the case comes to us, we ask only whether the district court clearly erred in the drug quantity it found, leaving us with the "definite and firm conviction that a mistake has been committed." *United States v. Sands*, 4 F.4th 417, 420 (6th Cir. 2021) (citation omitted).

This case does not leave me with that sort of conviction. Far from it, in fact. Trial evidence linked Brown and Reed—through Headrick, Eaton, and Norris—to Barajas's drug-dealing organization. Barajas's testimony established that Headrick bought from Barajas (and later redistributed downstream) many kilograms of methamphetamine—typically three per week, occasionally up to nine per week—while Brown and Reed participated in the conspiracy. In finding that Headrick trafficked "massive" quantities of methamphetamine, the district court concluded that Reed and Brown were each responsible for 4.5 kilograms of pure methamphetamine.

The majority opinion holds that the district court clearly erred in concluding that those 4.5 kilograms were pure, or "actual," methamphetamine. But some quick, back-of-the-envelope math suggests otherwise. Defendants stipulated that 2.665 kilograms of the methamphetamine seized from their coconspirators was pure methamphetamine, leaving only another 1.835 kilograms of pure methamphetamine to reach the 4.5-kilogram benchmark. The district court determined Reed's participation in the conspiracy to have lasted seven to nine months, seemingly less than the period during which Brown took part. If Headrick bought three kilograms of methamphetamine weekly from Barajas, a quite conservative estimate, his total haul during the shorter period of Reed's participation in the conspiracy fell somewhere between 84 and 108 kilograms.

Was it clear error for the district court to have deduced that 1.835 additional kilograms (out of the bottom-end estimate of 84) was pure? No. By my calculations, after all, the district court needed to conclude only that Headrick's supply was more than 2.185% pure, well below even the 5% benchmark the majority opinion seemingly suggests would be at the low end of the purity scale. Maj. Op. at 20; *see also id.* (noting testimony that "the 'new norm' for meth is 'crystal meth,'" which is believed to be more pure than homemade alternatives). This conclusion flows directly from the district court proceedings, where the district court recited Headrick's average weekly purchases amid an extended discussion of its obligation to make particularized findings. All of this easily satisfies *McReynolds*. 964 F.3d at 563 (requiring particularized findings that "the acts [of others] were within the scope of the defendant's agreement" and "that [those acts] were foreseeable to the defendant").

From our distant perch, we afford a sentencing court wide latitude in making approximations of drug quantities based on the evidence before it. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008); *see also United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022) (explaining that we affirm the district court's findings even where we might reach the opposite conclusion "so long as both stories are plausible on the record as a whole" (citation omitted)). I would follow that approach and affirm the district court. In any event, on remand, the district court has this analysis at its disposal in estimating Brown's and Reed's drug quantities anew, as the majority opinion requires.